Nancy **SULLIVAN** et al., Appellants,

v.

C. Francis **MURPHY**, Corporation Counsel of the District of Columbia, et al.

No. 71-1632.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 22, 1971, Dec. 13, 1971
and June 12, 1972.

Decided April 16, 1973.

As Amended May 9, 1973.

Ralph Temple, Washington, D. C., with whom were Edward L. Genn, Monroe H. Freedman and William L. Sollee, Washington, D. C., for appellants.

David P. Sutton, Asst. Corp. Counsel, with whom C. Francis Murphy, Corp. Counsel, and Richard W. Barton, Asst. Corp. Counsel, were on the petition for appellees.

On Appellees' Petition
for Rehearing

Before BAZELON, Chief Judge, and LEVENTHAL and ROBINSON, Circuit Judges.

LEVENTHAL, Circuit Judge:

This case arises from the civil disturbances in Washington, D. C., between April 22 and May 6, 1971, in connection with the "May Day" demonstrations protesting American military involvement in Southeast Asia. During this period a total of 14,517 persons were arrested on a variety of charges, the most common of which were disorderly conduct, violation of police lines, unlawful assembly, and unlawful entry onto public property. The vast majority of those arrested were required to post collateral bond to obtain their release from custody. Approximately 3,749 of the resulting cases were terminated administratively and never entered judicial channels. Another 9,666 cases came to final

disposition in the Superior Court of the District of Columbia, but only 871 of these proceeded to a full trial on the merits. The present controversy centers around the procedures used by police in effecting these arrests, the disposition of criminal charges, and the continued maintenance of arrest records.

## I. BACKGROUND

On May 24, 1971, this class action was brought in the United States District Court by the Plaintiffs[1] on behalf of themselves and all other persons "arrested. in the District of Columbia during the week of May 3, 1971, for whom the authorities lack a contemporary field arrest form, [P]olaroid photograph or other evidence of probable cause to support the charges [then] pending against them." Defendants (appellees) were the Corporation Counsel,[2] Chief of Police, Mayor, and Clerk of the Superior Court.[3] Plaintiffs requested, *inter alia,* that certain acts of the Defendants with respect to the arrests and ensuing prosecutions be declared unconstitutional,[4] that further prosecution of the Plaintiffs be enjoined, and that all sums posted as collateral bond to secure the release from detention of members of the plaintiff class be deposited in the District Court to be refunded to the Plaintiffs.

Plaintiffs accompanied their complaint with motions for a preliminary injunction and temporary restraining order barring the Defendants from prosecuting members of the plaintiff class or from causing their bond to be forfeited. The motions were denied by an order of the District Court (filed May 25, 1971) on the ground that Plaintiffs had failed to demonstrate either irreparable injury, or that the prosecution was rooted in harassment or bad faith. On May 26, on interlocutory appeal, 28 U.S.C. § 1292(a)(1), the motions panel of this court, after hearing argument, reversed the District Court's ruling, and entered an order enjoining Defendants from the further prosecution of any cases against members of the plaintiff class in which the Defendants "do not reasonably believe they have in their files and records adequate evidence to support probable cause for arrest and charge" and requiring Defendants to take all reasonable steps to assure that members of the plaintiff class received timely notice of the dismissal of any charge so as to avoid unnecessary court appearances.[5]

1. Nancy Sullivan and others, who instituted this action in the District Court, and who are the appellants in this court, were among those arrested during the May Day demonstrations. They will be referred to as "Plaintiffs."

2. The Corporation Counsel is responsible for prosecuting violations of District of Columbia municipal ordinances and other penal statutes for which the maximum punishment is a fine only, or a term of imprisonment not exceeding one year, and other specified offenses, including disorderly conduct, D.C.Code § 22–1107 (1967), that carry a penalty of both fine and imprisonment. D.C.Code § 23–101 (a), (b) (Supp. V 1972).

3. Under the District of Columbia Court Reorganization Act of 1970, the Superior Court in April 1971 had exclusive jurisdiction to hear misdemeanor cases, brought under any law applicable exclusively to the District. The law's retention of jurisdiction in the United States District Court related to prosecutions instituted

during the eighteen month period beginning February 1, 1971, for felonies carrying a penalty in excess of five years. D.C. Code § 11–923(b) (Supp. V 1972).

4. Plaintiffs specifically complain that they were arrested and prosecuted without probable cause in violation of the Fourth Amendment; that forfeitures of collateral were obtained and criminal defendants were forced to appear for trial although it was known that no *prima facie* case existed, contrary to the Fifth Amendment; and that Plaintiffs' Sixth Amendment right to adequate notice of charges and opportunity to prepare a defense were abridged during the course of prosecutions.

5. This May 26, 1971, order of the motions panel, Bazelon, C. J., and Tamm and Wilkey, JJ., took pains to point out that it—

does not prohibit [Defendants] from further *bona fide* prosecution in any case in which they reasonably believe that they have adequate evidence to support probable cause for arrest and prose-

The order was entered pending disposition of Plaintiffs' motion for a preliminary injunction. Sullivan v. Murphy, 143 U.S.App.D.C. 382, 444 F.2d 840 (1971).

On June 10, 1971, Plaintiffs amended the complaint to enlarge the plaintiff class to include all persons arrested during the week of May 3 with respect to whom, "irrespective of . . . alleged contemporaneous field arrest forms, photographs or other evidence, the . . . authorities could not, after an adequate personal consultation with the witness or witnesses, establish a prima facie case. . . ." The prayer for relief was also expanded by adding requests that the Defendants be enjoined from prosecuting any case that had not previously been screened to determine the existence of probable cause for arrest and prosecution, that all forfeitures of collateral bond be set aside except in cases for which adequate probable cause exists and in which the accused had knowingly and intelligently waived his right to a trial on the merits, that a judgment issue declaring the rights of the Plaintiffs to the expungement of all arrest records pertaining to members of the plaintiff class, and that, pending determination of the Plaintiff's right to expungement, an order issue prohibiting the dissemination of these arrest records.

The District Court entered its findings and order with respect to Plaintiffs' motion for a preliminary injunction on June 23, 1971. Judge Corcoran concluded that Plaintiffs' suit was maintainable as a class action; that no modification of our order of May 26, 1971, was necessary to prevent irreparable injury to the plaintiff class, and that consideration of Plaintiffs' request to expunge arrest records was premature. He therefore directed that the May 26 order continue in effect for an indefinite period of time but denied the Plaintiffs' prayers in all other respects.

On August 3, 1971, the District Court denied Plaintiffs' written motion, filed July 2, to expand relief and also denied a motion made during oral argument for an order directing the expungement of all arrest records in the Superior Court relating to members of the plaintiff class.

This appeal followed.

On September 22, 1971 the then-sitting motions panel of this court heard oral argument on Plaintiffs' motion, filed August 19, 1971, for summary reversal of the order denying the preliminary injunction, and Defendants' cross-motion of September 9, 1971, for summary affirmance.

On October 1 1971, this court entered an order (unreported) [6] that granted most of the relief Plaintiffs had sought. The matter of expunging arrest records was reserved. Defendants filed a petition for rehearing; we heard argument

cution, nor does it preclude the [Defendants] from suspending any or all prosecutions until the hearing on the preliminary injunction . . . or until such time as they are able to make an orderly determination in each case as to whether prosecution is to be continued.

6. The order, entered by the present division of this court, directed the District Court: (1) to enjoin Defendants from prosecuting any member of the plaintiff class unless a prior screening—including interviews of prospective witnesses—disclosed the existence of a *prima facie* case; (2) to order that timely notice be given to all members of the plaintiff class whose criminal charges remained outstanding as to whether they would be required to appear for trial; (3) to require that all forfeitures of collateral bond be set aside unless it is determined both that there was probable cause for the arrest and that a *prima facie* case existed against the person who forfeited collateral; (4) to enjoin the Defendants from disseminating any arrest records pertaining to any member of the plaintiff class who had not been convicted of the offense charged; (5) to require that Defendants obtain the return of all arrest records concerning members of the plaintiff class who had not been convicted; (6) to order that Defendants demonstrate compliance with this and all prior orders and respond to certain inquiries of this court.

thereon on December 13, 1971; received additional memoranda; and heard reargument on July 12, 1972.

## II. THE FACTUAL SETTING

The case is before us on interlocutory appeal from denial of a preliminary injunction, and the facts may be subject to amplification and refinement upon entry of a final judgment on a full record. A heft of the pertinent facts, sufficient for interlocutory purposes, is available not only from affidavits filed in District Court with the motion papers, including Superior Court transcripts incorporated therein, and files of the District Court and this court in related cases, but also information supplied by Defendants to this court at our request.

Both the Metropolitan Police and the Clerk of the Superior Court maintain systems of computerized files. This court was furnished with a computer print-out listing each case processed by the Superior Court pertaining to a member of the plaintiff class, together with its ultimate disposition. It developed, however, that these records were, at the same time, both voluminous and fragmentary. We directed the Defendants to provide additional statistical data relating to the arrests of members of the plaintiff class and to the disposition of the criminal charges that were lodged against them. We appreciate the diligent efforts of the Corporation Counsel and the Clerk of the Superior Court in securing these data. We now present the shape of the circumstances of the fateful period as they may fairly be discerned from the record before us.

### A. *Arrests.*

One of the Plaintiffs' chief grievances is addressed to the way arrests were made during the May Day period.[7] We shall first outline the arrest procedures customarily employed by the Metropolitan Police Department, and then consider the facts surrounding the arrests put at issue in the instant case.

### 1. *District of Columbia arrest procedures*

#### *Customary procedures*

A police officer in the District of Columbia has authority to arrest without a warrant any person whom he has probable cause to believe has committed an offense in his presence.[8] When the arresting officer does not proceed by way of mere citation to appear at a later date, he ordinarily escorts his prisoner to the local precinct stationhouse, where the arrest is recorded and the defendant booked. Customarily, the evidence shows, persons arrested for violating municipal ordinances or other petty offenses of the disorderly conduct type are not fingerprinted or photographed, although this is subject to the booking officer's discretion. During the booking process, the arresting officer fills out a complaint form, identifying the person taken into custody and describing both the circumstances of the apprehension and the precise nature of the charge; the information so recorded is later used by the Corporation Counsel as the basis for preparing a formal information charging the defendant.

Following completion of the booking procedures, the person arrested is given an opportunity to secure his release by posting collateral bond at the stationhouse in accordance with a schedule prescribed by the Superior Court.[9] In the

---

7. Although the complaint is addressed specifically to the week of May 3, we shall allude to certain events both before and after this period to put the facts in proper context.

8. D.C.Code § 23–581(a)(1)(B) (Supp. V, 1972).

9. *See* D.C.Code § 23–1110(a) (Supp. V, 1972).

 D.C.Code § 23–1110(b)(1) provides that a person charged with a misdemeanor may be issued a citation at the place of arrest, in lieu of being taken into custody; and § 23–1110(b)(2) provides that a person

case of petty offenses, the accused may elect to waive trial altogether by forfeiting the collateral security.

The District of Columbia Code prescribes that every person taken into custody, whether with or without a warrant, shall be brought before a judicial officer "without unnecessary delay." [10]

*Massive disorder procedures*

During the widespread rioting and looting that followed the 1968 assassination of Dr. Martin Luther King, it became obvious that the customary arrest, booking, and arraignment procedures were too cumbersome to be used in periods of massive civil disorder.[11] Specifically, the requirement that arresting officers escort their prisoners through the booking process and be available to testify at pretrial hearings severely depleted the number of policemen present for street duty at a time when they were most urgently needed.[12]

In response to the recommendations of various committees appointed in the aftermath of the 1968 riots, new procedures were adopted by the Superior Court and by the Police Department to expedite the processing of persons arrested during large scale disorders.[13] Under this plan, arresting officers were to complete a Field Arrest Form on the scene, recording the identity of the arrestee, the circumstances of the apprehension—including the charge and material elements of the specification—the name, unit and badge number of the arresting officer, and the identity of any other officer who had witnessed the arrest.[14] As a further means of supporting the validity of the apprehension, a Polaroid photograph was to be taken showing "the arresting officer and his prisoner together." [15] Once these field procedures had been completed, the officer who made the arrest was free to transfer the arrestee to other police personnel for transportation and booking, thus enabling him to remain at the scene of the disorder.

Bookings were to be accomplished at central locations on the basis of the information set forth in the arrest forms.[16] It was also contemplated that the Corporation Counsel would use these data to prepare informations against the accused, obviating the need to interview each arresting officer. Finally, and significantly, the Superior Court agreed to accept the completed arrest forms and Polaroid photos, in lieu of direct testimony by the arresting officer at the presentment, as evidence of probable cause, to support an order holding the accused to answer.[17]

apprehended on misdemeanor charges may be released from custody upon being issued a citation after booking, in lieu of posting bond. These citation procedures were not utilized during the May Day demonstrations, although they have since been implemented by police departmental regulations. Metropolitan Police Department, General Order, Series 502, Number 6 (Dec. 1, 1971).

10. D.C.Code § 23–562(c)(1) (Supp. V, 1972). *See* Rule 5(a), D.C. Superior Court Criminal Rules (1971).

11. *See* W. Dobrovir, Justice in Time of Crisis, A Staff Report to the District of Columbia on the Administration of Justice Under Emergency Conditions 7–8, 12–14, 77–80 (1969).

12. *Id.* at 13.

13. *E. g.*, Order, District of Columbia Court of General Sessions [now Superior Court] Administration of Justice During a Major

Civil Disorder (Nov. 12, 1969) (per Greene, C. J.), reprinted as Appendix F to Judicial Conference of the District of Columbia Circuit, Report of the Committee on the Administration of Justice Under Emergency Conditions (March, 1973) [hereinafter, 1973 Report].

14. Metropolitan Police Department, General Order No. 6, Series 1968, Procedures for Handling Prisoners and Property During Civil Disturbances, at 2–3 (August 16, 1968).

15. *Id.* at 4.

16. *See* Metropolitan Police Department, General Order No. 7, Series 1968, Operation of the Emergency Property Receiving Office, Booking Units and Prisoner Control Center During Civil Disturbances and Other Emergency Situations, at 2–3 (August 16, 1968).

17. Order, *supra* note 13, at 2, 1973 Report at 246.

## 2. Protest Activity Through Sunday, May 2, 1971

Beginning in late April, 1971, Washington became the scene of numerous demonstrations, marches, and protest activities designed to focus national attention upon the continuing U. S. military presence in Southeast Asia. In their early stages, these took the form of sporadic and isolated encounters involving only a handful of demonstrators. But by May 3 they had grown to immense proportions, culminating in a massive confrontation with police, which saw thousands arrested and which taxed the District's criminal justice system to the breaking point.

Into this vortex tens of thousands of people were drawn. They came from all parts of the nation, many of them traveling long distances to participate in the demonstrations planned for the Nation's capitol. Their ranks spanned American society; and although college undergraduates predominated, people from many different stations in life were also involved.

They represented a broad spectrum of philosophy and goals. Some were from the outset dedicated to provoking direct, and indeed violent, confrontations with public authority. Others, though committed to nonviolence, espoused the tactics of civil disobedience. Still others were determined to carry out their protest activity by entirely lawful means. Finally there were the bystanders and observers—thousands who were not participating in the anti-war movement, but were pulled by the magnet of viewing first hand the events of great moment they sensed were about to unfold.

Several minor demonstrations took place during the week of April 11. The first large scale protests were scheduled for the week of April 18 through 24. By Monday, April 18, several thousand members of the Vietnam Veterans Against the War had arrived in the city. A series of demonstrations was conducted at the Capitol, and a delegation of these veterans attending a meeting of the Senate Foreign Relations Committee. Principally, however, the activities of these veterans took the form of buttonholing individual members of Congress in an effort to gain support for end-the-war legislation.

On Friday, April 23, demonstrators numbering in the tens of thousands began to assemble at a campsite that had been established, with Justice Department permission, in West Potomac Park. The following day more than 175,000 persons, according to final police estimates, participated in a march from the Ellipse to the Capitol. It culminated in a rally lasting some five hours, which featured speeches by leaders of the anti-war movement and by several members of Congress.

Throughout the week of April 18, protest activities had been nonviolent and generally well-disciplined. There were no serious encounters with police, and arrests were few. But following the march and rally of Saturday, April 24, a more militant faction gained control of the protest, and some of the initial groups withdrew.[18] The new demonstration leaders announced a program of mass civil disobedience.[19] A program was developed to conduct protest activities at specific Government offices during the week of April 26, apparently with the hope of inducing Federal employees to join the protest by absenting themselves from work, and, if this should fail, to threaten a blockade May 3 of highways leading into the capital. The demands were for an immediate withdrawal of troops from Southeast Asia.

18. The Vietnam Veterans Against the War formally withdrew from all activities on April 23. The National Peace Action Coalition, which had sponsored the march of April 24, also terminated its participation.

19. These actions prompted many who had formerly been active in the peace movement to disassociate themselves from these proposals.

Demonstrations were held at Selective Service Headquarters on Tuesday, April 27th and Wednesday the 28th. In all, there were more than 255 arrests, and most of those apprehended were charged with disorderly conduct.

The following day, the focus of the protest shifted to the Department of Health, Education and Welfare, where 243 persons were taken into custody for parading without a permit.

On Friday, April 30, an effort was made to block entrances to the Department of Justice and to interfere with employees going to and from work. A total of 385 persons were arrested, primarily on charges of disorderly conduct and obstructing building exits.

Saturday, May 1, was a day of relative calm, and only two arrests took place in connection with protest activity. That evening, however, the demonstrators' permit to use West Potomac Park was revoked on the ground that its conditions had repeatedly been violated.

Sunday morning, May 2, a formal order was issued by the Government directing all persons to vacate the Potomac Park campsite. After waiting several hours for compliance, the police proceeded to clear the area. A confrontation followed; and 403 persons were taken into custody, most of them on charges of unlawful entry or disorderly conduct.

As to all arrests made prior to May 3 in connection with protest activity, it appears that the Metropolitan Police adhered to the field procedures established for massive disorder situations. Field Arrest Forms were duly prepared, and photographs were taken contemporaneous with apprehension. It also appears that the police followed a policy of refusing to accept stationhouse collateral from those who had been taken into custody.[20] Instead, the Corporation Counsel filed informations, and the persons arrested were then brought before the Superior Court, whose judges, sitting in continuous session, conducted preliminary hearings and fixed bail.

3. *The Events of Monday, May 3, 1971.*

Some 7,926 arrests took place on Monday, May 3, 1971. These resulted in disorderly conduct charges lodged against 7,599 persons. The resulting strains on the criminal justice system were unparalleled. Police resources were stretched to the limit; detention facilities were filled to overflowing; the prosecutor's office was inundated with complaints; and the Superior Court's calendar was choked for months.

a. *Protest activities.*

During the weekend of April 30 through May 2, protest leaders announced the specifics of their plan to block access to the city in the midst of Monday's rush hour. Key points were selected for obstruction: the Roosevelt, Key, Memorial, and 14th Street Bridges, Dupont, Washington, and Scott Circles, Mount Vernon Square, and the intersections of Constitution and Pennsylvania Avenues. Most Federal employees live in the Maryland and Virginia suburbs and use these arteries daily in commuting to their offices. If the demonstrators' program had become effective, the result would have been a massive blockage of the operation of the Government.

In preparation, some Federal offices asked volunteer employees to report for work in the early morning hours and to prepare for a protracted stay. Others permitted workers to remain at home but announced that their absence would be charged against accrued leave time. All available police reserves were ordered to duty. The District of Columbia National Guard was called up for annual training. Some 4,000 Federal troops were deployed in the city at the request of Police Chief Jerry Wilson.

---

20. Throughout the week of April 26 the Superior Court sat in continuous session, and the police contended that D.C.Code § 23–1110(a) (allowing the posting of stationhouse bond) was controlling only as to hours during which the court was closed.

The authorities were generally able to anticipate the movements that the demonstrators planned. Many protesters arrived at the designated target locations only to find ample numbers of police and support personnel already in position. Several attempts were made to block the critical intersections with disabled vehicles and makeshift barriers, but the police removed these in short order. Police, fire and sanitation personnel also counteracted efforts to set trash containers afire and to strew the streets with nails and broken glass. At Key Bridge and the 14th Street Bridges, demonstrators charged police lines en masse, but were repulsed by police with truncheons and barrages of tear gas. For the most part, the police succeeded in frustrating the planned disruptions; and the traffic snarls that did ensue were limited to delays of from eight to ten minutes. Some Federal employees were late in reporting for work. But absences, reported officials at the close of the day, had in fact been lower than on an average workday.

b. *Arrest procedures.*

The authorities were confronted on May 3 with the need to prevent any build-up of large numbers of persons at the focal points of the demonstration. There was a danger that the police ranks would themselves be overwhelmed. There was also the possibility that crowds of people would, by the mere fact of their presence, thwart efforts to keep the highways open.

The police responded to the situation by making mass arrests. In so doing, however, they swept up innocent persons along with the lawbreakers. The *Washington Star* quoted Assistant Police Chief Hughes as saying: "We had them . . . and we had to do something right away. Someone can judge the rightness of it later." [21] This is, of course, not evidence as such, but it vividly summarizes the situation fairly apprehended from the record.

The crux of the question that comes to focus in the case at bar is whether the police judgment, in coping with the problem on the streets, to take detention action that impeded the liberty of some innocent along with the guilty, was accompanied by post-arrest procedures which, at least in the context of the mass arrests, operated to deny constitutional rights.

The record indicates that a few of the May 3 arrests—apparently those taking place in the early morning hours—were effected pursuant to the established field arrest procedures. The Corporation Counsel states that his office prepared approximately 275 informations "on the basis of data reflected in field arrest forms" and some additional 60 informations "on the basis of papers forwarded by the Police Department which, although not as informative as field arrest forms" might nevertheless be regarded as their substantial equivalent.

The pivotal moment was 6:23 a. m., when Police Chief Jerry Wilson issued an order suspending normal field arrest procedures. According to Chief Wilson's sworn testimony in another action, incorporated into the record of this case, his decision was motivated by reports that demonstrators were in the process of damaging automobiles and blocking traffic at a number of locations. He also testified as to his apprehension of "serious property damage or death or serious injury to innocent persons if the city were closed or if the demonstrators should decide to do something more than simply block traffic, as, for example, loot or engage in acts of trashing or arson," and his conclusion that "it is not practical for the police to rapidly arrest hundreds of individuals who are blocking traffic and process them through the field arrest process." [22]

21. Washington Star, Monday, May 3, 1972, at A-3.

22. Deposition of Police Chief Jerry Wilson taken in Kuhn v. Wilson (No. CA 956-71, D.D.C.) at 81.

This suspension remained in effect throughout the day, and for the vast majority of the nearly eight thousand persons taken into custody neither field arrest forms nor Polaroid photographs were prepared at the time of apprehension. Instead, the arrestees were simply loaded aboard vehicles and taken to various detention areas that had been established, principally Robert F. Kennedy Stadium and the District of Columbia Jail. Arresting officers did not accompany their prisoners. Indeed, in many instances, the arrestee had no way of even becoming aware of the identity of the officer making the arrest, because many policemen wore neither badges nor name tags.

While no final evaluation or determination is made at this time, Plaintiffs have presented evidence that many persons were deprived of their liberty without a scintilla of evidence tending to show that they had committed an offense. The following, relating to different areas of the city of significant import on this day, are illustrative:

The record incorporates testimony of a professor of law at George Washington University that, while standing on a sidewalk near the University precincts (approximately 20th and G St. N.W.) wearing a "Legal Observer" armband, he was arrested without justification by a police officer who accused the professor of bumping into him. He stated that the officer was not wearing a badge or name tag and that the policeman did not inform him of the charge he intended to lodge.[23]

A resident of Georgetown relates that he was arrested on M Street, N.W., in the vicinity of 28th Street while attempting to obey the instructions of another police officer who had told him to return to his home.

An observer in the area of Mount Vernon Square (7th and K Streets, N. W.) stated under oath:

> Then there were several other people who were just traveling through the area. These people looked to be demonstrators, but they were simply marching—they were simply walking down the street, and the police officers would say, "get those two" and they were arrested.

A member of the District of Columbia bar, who was a legal observer in the Dupont Circle area (approximately 19th and O Streets, N.W.) swears that he was "arrested for no apparent cause. He was not demonstrating and not blocking traffic." He witnessed the arrests of other persons who were "just walking through the circle and around the circle" and who, immediately prior to their arrests, were not, in his opinion, "doing anything that would call for an arrest on [sic] disorderly conduct, or any other offense."

c. *Booking procedures.*

In the absence of field arrest forms, the authorities lacked any information concerning the thousands of persons who were being held in police custody. There was no record of time, location or circumstances of the arrests. Manifestly, the District of Columbia was at this time utterly incapable of preparing cases against the arrestees. If the prisoners had been arraigned, the Superior Court would plainly have been compelled to order their release[24] for failure to show probable cause for arrest. In a post hoc effort to remedy this situation, special booking procedures were estab-

---

23. This professor was permitted to obtain release on posting a $10 collateral bond. No information was filed against him.

24. Rule 5, D.C. Superior Court Rules (1971) provides, *inter alia*:
 If from the evidence it appears to the court that there is probable cause to believe that an offense has been committed and that the defendant has committed it, the court shall forthwith hold him to answer in the court having jurisdiction to try the defendant; otherwise the court shall discharge him.
 In fact, those prisoners who were arraigned on May 3, were discharged. See pages 951–952, *infra.*

lished to gather and record information concerning the persons arrested and to photograph, fingerprint and formally charge them.

It appears that many of the persons held at the District of Columbia Jail were either processed there or transferred to local police precincts for booking. Those who had been detained at RFK Stadium—together with some prisoners being held at the Jail and at other locations—were sent to a makeshift booking center that had been established at the District of Columbia Coliseum, located close by the Stadium. This processing facility was staffed in large part by volunteer attorneys from various divisions of the Justice Department, acting under the supervision of Metropolitan Police officers. Their testimony, given under subpoena, is incorporated in the record.

Prisoners were taken from the detention areas to a table where "long form" arrest records (identified as Police Department Form number 255) were prepared. The Department of Justice employees who assisted in the bookings were told to record the name, address and physical description of each arrestee. In the blank marked "Original Charge" they were instructed to enter the words "Disorderly Conduct." At their initial briefing, they had been given a list containing the names, badge numbers and unit designations of seven police officers. Under the caption "Name of Arresting Officers," they were told to insert "one name taken seriatim from [this] list of seven;" and they were specifically told to leave blank that portion of the form in which the circumstances of the arrest were to be recorded.

Once the "long forms" had been completed, prisoners were escorted to a second table where field arrest forms and blank FBI fingerprint cards were filled out. Those working as clerks in this section had also been given the list of seven police officers' names to record under the heading "Arresting Officer". For the most part, however, they merely copied whatever name had been entered on the previously completed "long forms."

When these steps had been accomplished, the prisoners were taken to an area where they were fingerprinted and photographed. Any who refused to submit to this procedure were returned to detention, in the locations that had come to be dubbed "detention pens."

Arrestees who had undergone processing were given an opportunity to secure their release by posting collateral bond at the detention center. Even such acquiescence was no guarantee of prompt release, as appears from the affidavits of one person held for 15½ hours at RFK Stadium and the Coliseum, another for "about 20 hours" at the same locations, and a third for 17 hours at the D. C. Jail and the 14th Precinct lock-up.[25]

A significant number of the detainees refused to submit to the process of fingerprint or photographic identification, or even to divulge their names, resulting, as already noted, in their remittance to detention. This situation led to three actions in the District of Columbia courts.

The first of these was a petition for habeas corpus relief brought in the Superior Court on May 3, *Doe v. Wilson*, Civ. No. SP50-71. Chief Judge Greene on that date issued an order directing the Defendants herein to appear and show cause why persons with respect to whom no contemporaneous field arrest form or Polaroid photograph existed were being held. The writ issued the following day, but its execution was stayed pending appeal. On the morning

---

25. In its 1973 Report to the Judicial Conferences, the Committee on the Administration of Justice Under Emergency Conditions recommended that detention during mass arrests be limited to a maximum of three hours, and that earlier release be provided where, because of the suspension of field arrest procedures, the likelihood of successful prosecution is minimal. 1973 Report, *supra* note 13, at 192–93.

of Wednesday, May 5, the District of Columbia Court of Appeals affirmed that portion of Chief Judge Greene's order which mandated the release of prisoners so detained but added the requirement that, as a condition of their release, the arrestees must undergo the booking procedure. Another portion of the order specified that any who refused to submit to booking were to be arraigned in the Superior Court on the afternoon of May 5.

About 1,100 prisoners agreed to be processed, were fingerprinted and photographed, and were released without being required to post collateral bond.

Approximately 400 persons who refused to be processed were presented before Superior Court Judges Hamilton and Newman on Wednesday, May 5. Since their names were unknown, the office of the Corporation Counsel had in each case prepared a "John Doe" information, charging the arrestee with disorderly conduct. The Government was ordered to represent whether it could connect any of these persons with criminal activity. When the Government revealed that it could not do so, the trial judges dismissed all informations and ordered the immediate release of the defendants.

On Thursday, May 6, in response to Defendants' application, Chief Judge Greene issued an order that directed some 500 persons, apparently then confined in the cell block of the United States Courthouse, to submit to processing, but limited the dissemination of the information acquired through the booking procedures. District of Columbia v. Approximately Five Hundred Persons, CA 4602–71 (D.C. Superior Ct., May 6, 1971). This order was modified on appeal and, as modified, issued on May 7. It will be the subject of more detailed discussion later in this opinion (see pages 958–959 *infra.*).

d. *Release of persons arrested on May 3.*

As previously noted, during the week immediately preceding May 3, the Met-

ropolitan Police discontinued the implementation of the Superior Court regulation that permitted individuals arrested for offenses of the kind here involved to obtain their release by posting collateral bond at the local precinct, and instead put into effect a policy of holding all persons arrested in police custody until bail was fixed at formal arraignment proceedings in the Superior Court.

*Persons arraigned*

As to persons arrested on May 3, the Corporation counsel prepared some 275 informations on the basis of field arrest forms that had been filled out on the scene and which were apparently regular on their face. An additional 165 persons for whom contemporaneous arrest forms were not available were also arraigned. While in 60 of these cases the Corporation Counsel drafted informations on the basis of other data supplied by the police, for 105 of the persons arrested the only information at hand was their names. Informations were filed in about 25 of these 105 cases; the remaining 80 were no-papered at arraignment. Of those persons who were actually charged and arraigned, many were apparently released upon a showing that the Government was unable to establish probable cause for the arrest. Others, however, were required to post bail as high as $250.

*Persons released on posting collateral with police*

For the nearly eight thousand persons arrested May 3, however, the infeasibility of conducting so many arraignments in Superior Court led to the discontinuance of the detention-cum-(prompt) arraignment procedure. Accordingly, the system of accepting stationhouse collateral was re-instituted, and an order was issued, apparently some time during the morning of May 3, authorizing police officers at the detention centers to release prisoners who had completed the booking process upon payment of $10 collateral cash bonds. Each prisoner was to be informed that he might either request a trial date or elect to forfeit the

collateral in lieu of trial. The names of all persons who sought trials—together with the date scheduled for their appearances—were to be recorded on a so-called "collateral list," which would be forwarded to the Clerk of the Superior Court. According to data furnished by Defendants, "[a]pproximately 1,822 [detainees] elected to forfeit collateral [at the various detention centers] and approximately 2,878 elected to stand trial."

Plaintiffs maintain that collateral forfeitures were obtained by the authorities from persons who acted "without full knowledge of their rights to a trial or not being advised thereof."

The affidavit of an attorney who subsequently represented many of the persons arrested sets forth:

> In virtually all such cases, the election to forfeit had been made without the advice of counsel. Furthermore, in most cases, it is my information and belief that the police officers involved had either denied the arrestees the right of election to stand trial, or had induced forfeiture through misleading information, such as that it [forfeiture] was the only way arrestees could be released.

One May 3 arrestee, who was detained in the cells in the basement of the Superior Court building, and who secured his release by posting and forfeiting $10 collateral, stated in an affidavit:

> At the time of release I requested a trial date and was told that I could not get one then and would to visit [sic] the Superior Court in person within a year in order to request a date. In response to questioning I was told that there was no other way to get a trial date. The same information concerning the trial date was given to the person in front of me and [the person] behind me.[26]

Defendants take issue with the charge of misrepresentation and with the Plain-tiffs' account of circumstances under which these elections to forfeit collateral took place.

*Persons released without collateral*

In addition to the 840 defendants who were arraigned on May 3 and the 4,700 persons who posted collateral, some 1,100 of the May 3 arrestees were released without bond after submitting to the booking process, as previously indicated. Some 227 juveniles were released in parental custody, and an additional 600 persons who had neither been booked nor posted collateral were set free because of a misunderstanding on the part of jail personnel.

*4. Tuesday, May 4.*

Their efforts to block access to the city having been effectively checked, the protesters turned their attentions once again upon specific Federal offices. On May 4 they demonstrated in front of the Department of Justice building. There was no violence, but sidewalks and building entrances were obstructed by throngs of people. Arrests totalled 3,434 throughout the city—1,592 for violating police lines; 1,253 for unlawful assembly; and the remainder for miscellaneous infractions of a minor nature.

At 5:40 a. m. May 4, the order of May 3 that suspended field arrest procedures was rescinded; and it appears that there was widespread use of field arrest forms and Polaroid cameras at the scene of the demonstrations. Nevertheless, a number of the May 4 apprehensions were made under distinctly questionable circumstances, according to evidence submitted by Plaintiffs. In one case the accused was allegedly taken into custody while making a telephone call from a public booth. Upon refusing to disclose to a police officer the identity of the party with whom she had been speaking, she was arrested for inciting to riot, "which charge was later 'dropped' and changed to obstructing a sidewalk and

---

26. As will subsequently be discussed (page 963, *infra*) Rule 35 (b) of the Superior-Court Rules provides that any action to vacate a forfeiture of collateral bond must be commenced within 90 days of the date of the forfeiture.

disorderly conduct." When she appeared for trial, all charges were dismissed; and it is claimed that at no time were any of them supported by any basis in fact.

In another instance, say Plaintiffs, notwithstanding the existence of a field arrest form and Polaroid photograph, regular on their face and apparently made at the time of arrest, an arresting officer later testified at trial "not only that he did not see the defendant sitting in the street [as apparently charged] but had arrested him solely on the basis that another officer delivered [the accused] to him for processing."

In another instance, in which an apparently regular, contemporaneous arrest form and a photograph were likewise available, when the unlawful assembly charge was brought to trial, an acquittal followed from the testimony of the arresting officer himself "that he had failed to see [the accused] sitting in the street or committing any offense." In another, almost identical, situation, a nolle prosequi was entered when the arresting officer informed the court prior to trial that he would testify he had not seen the defendant committing the offense alleged. Again, the prescribed arrest form and Polaroid photograph were available.

On May 4, and indeed throughout the remainder of the period of unrest, full arrest records—including fingerprints —apparently were compiled for each person taken into custody. The record before us does not specifically delineate the procedures used to book or admit to bail persons arrested on Tuesday, May 4, or the manner in which the May 4 arrestees obtained their release from police detention. Defendants have stated: "Informations were filed on the basis of the [data] provided by the field arrest forms and a general description supplied by police officials of the conduct of the arrested individuals."

5. *Arrests made on · and after Wednesday, May 5.*

Arrests on May 5 totalled 1,507, some 1,245 of these being for unlawful entry; and it is alleged by defendants that a field arrest form was prepared and a photograph taken of each defendant at the time of apprehension. Approximately 1,243 of the arrests were effected on the grounds of the United States Capitol; and all cases arising therefrom were prosecuted by the United States Attorney, rather than the Corporation Counsel.

May 5 appears to have been the last day of significant protest activity. Only 35 arrests were made in connection with demonstrations held on Thursday, May 6; and police statistics do not show any arrests for unlawful demonstrations thereafter.

B. *Prosecutions and Disposition of Cases*

We turn to the material in the record concerning the prosecution and disposition of criminal actions instituted against members of the plaintiff class.

1. *Preparation of cases arising from May 3 arrests.*

In the wake of the mass arrests that took place on May 3, the public authorities were confronted with essentially the following situation: Nearly eight thousand people, in all, had been held in police custody. In only a relative handful of instances were field arrest forms available. Some 2,878 persons had elected to stand trial and had been assigned dates to appear in the Superior Court. Doubtless a large number of the total arrests made May 3 had been made with ample justification. But there were certainly a significant number that were made without the factual basis necessary to substantiate a showing of guilt, or indeed a lawful arrest. If called upon to substantiate probable cause for a particular arrest, the police could not have done so. If required to file an information charging a specific person, the Cor-

poration Counsel could not have done so. There was no way to ascertain what act was, or was alleged to have been, committed by a particular defendant; when and where this was done; who might have witnessed the act; or even who was the arresting officer.

To overcome this problem, at least in part, a photographic display was held at police headquarters on Saturday, May 8 and throughout the following week. Police officers who had been at the scene of the demonstrations viewed the booking photographs taken of the persons arrested on May 3 while they were being held in detention. "Once an officer identified a particular defendant, [an Assistant Corporation Counsel] would discuss the case with the police officer and make a determination whether an information should be filed." If the policemen felt able to recall the specifics of a given arrest from examination of the booking photographs, an information was prepared, and the officer noted as a potential witness.

As for the arrested persons whose photographs prompted no spark of recognition, the Corporation Counsel's office no-papered each case. Of the 2,878 May 3 arrestees whose names appeared on the "collateral list" by virtue of their having been assigned trial dates, in approximately 2,600 cases the Corporation Counsel determined to file no information. Moreover, pursuant to an agreement between Defendants and counsel for Plaintiffs in the case at bar, the latter were supplied with a list of the names and addresses of the accused whose cases were to be no-papered, so they could avoid the inconvenience of unnecessary court appearances.

Plaintiffs, however, dispute the sufficiency of the efforts made to inform "collateral list" defendants that their cases would not be called for trial. They note, for example, the cases of two persons who were arrested on May 3 under purportedly identical circumstances. One of these was no-papered, apparently with reasonably prompt notice to the accused. The other was called for trial in the Superior Court on June 10, 1971—subsequent to the May 26 temporary restraining order, enjoining Defendants from prosecuting any case in which they could not establish probable cause for arrest. When the accused appeared for trial, bringing with him an attorney and defense witness, he was informed that his case was being no-papered. Plaintiffs have also supplied an affidavit from an attorney who was active in defending numerous persons accused in connection with the May Day demonstrations. It states in part:

[A]s of . . . July 2, 1971, two or three collateral cases have been coming in [to the Superior Court] daily; . . . [I]n addition, serious problems have arisen for those who have lost their collateral receipts[,] in that the Court will not return their collateral without such receipts . . . and when the police are contacted, they refuse to give a duplicate

. . . .

2. *Disposition of cases before the Superior Court.*

The data available do not provide a breakdown of all the cases in which informations were filed in the Superior Court.[27] The following is a general picture of what emerges from the material available.

Taking the most recent data, and excluding the cases that were no-papered by the Corporation Counsel, it appears

27. The most recent tabulation of cases processed by the Superior Court reflects the status of 9,687 cases that had reached final disposition as of December 6, 1971. But the only detailed breakdown of disposition statistics (classifying arrestees according to whether they had been arraigned in Superior Court)—compiled on the basis of a Superior Court computer print-out dated September 25, 1971–covers 7,399 cases. The discrepancy of 2,288 cases cannot be attributed to cases processed between September 25, and December 6, since other data shows that not more than 483 cases proceeded to final disposition during this interval.

that the Superior Court processed some 6,749 cases begun by informations lodged by the Corporation Counsel. In 1,293 of these the accused forfeited collateral by failure to appear for an assigned trial date. An additional 874 cases went to a judgment on the merits. There were 605 pleas of nolo contendere, and 24 pleas of guilty. Of the cases that went to trial, there were 117 acquittals and 128 convictions.

What is striking is the large number of cases—indeed, more than two-thirds of the total—that proceeded to final disposition by the entry of a nolle prosequi (1008 cases) or the granting of a motion to dismiss the information (3,574 cases). The overwhelming bulk [28] of these dismissals resulted from want of prosecution, lack of evidence, and inability of the Government to produce at trial witnesses upon whose testimony they had intended to rely.

Obviously, Plaintiffs do not quarrel with the fact that so few of these cases actually proceeded to disposition on the merits. Rather, they point to the unusually high number of dismissals as confirmation that the underlying arrests were without foundation. They complain, in addition, that many of these dismissals were granted only after the accused had undergone the expense and inconvenience of appearing for trial— even though a pretrial review of the evidence would have disclosed that a *prima facie* case could not have been proven.

The statistical data available provide a breakdown of only about half the orders granting motions to dismiss, and may not be representative of the others. Such data as we have show this: In about two-thirds of the cases covered by the detailed breakdown available the motion to dismiss was not granted until trial on the merits.[29] In addition to these data, the record before us includes numerous instances cited by Plaintiffs —all of them from the period subsequent to the issuance of the May 26 restraining order—in which, despite representations by the Corporation Counsel that there was probable cause for arrest, a nolle prosequi was entered or a motion to dismiss the information was granted during trial on the merits. Typical of the situations noted: arresting officer informed the trial judge that he had not seen the accused committing the offense charged; arresting officer testified that he had not seen the accused "committing any offense"; case dismissed and both accused and defense witness stated in affidavits that there was no evidence whatever to support the charge; arresting officer testified that he had taken the accused into custody only because another officer delivered the accused to him; "[T]he evidence presented by the government showed no criminal activity whatsoever."; arresting officer "could produce no evidence of criminal activity"; officer did not recall arresting the accused or what the accused was doing at the time of the arrest; "the arresting

---

**28.** In about 10% of the cases, the ultimate disposition rested on a judicial determination that the Corporation Counsel lacked jurisdiction to prosecute the offense charged or that the municipal ordinance under which the charge had been brought was defective. In this class, a nolle prosequi was entered in 198 cases arising from demonstrations at the Department of Health, Education and Welfare on April 29, following a challenge of the pertinent regulation. Similarly, 309 prosecutions based on the April 30 demonstrations of the Department of Justice were dismissed after the District of Co-

lumbia Court of Appeals held in District of Columbia v. Ackerman, 283 A.2d 24 (D.C.App.1971), that prosecutions under the applicable statute could only be brought by the United States Attorney.

**29.** The only detailed breakdown of dismissals is contained in the Superior Court's September 25, 1971, computer print-out. This shows 579 motions granted at arraignment and 1,077 granted at trial on the merits. These figures are not complete, since the December 6 report shows a total of 3,574 cases disposed of by motions to dismiss.

officer simply cannot identify the defendant committing any criminal activity."

Affidavits have also been introduced by the Plaintiffs, purporting to show that, of the cases called for trial in the Superior Court between May 28 and July 2, 1971, a significant number failed to go to trial because the Corporation Counsel entered a nolle prosequi, consented to dismissal, or was unprepared to proceed. For convenience we present the data in these affidavits in tabular form:

Cases called for trial, Superior Court
for May Day offenses (1971)

| | May 28 | June 1 | June 2 | June 14 | June 16 |
|---|---|---|---|---|---|
| Nolle prosequi entered | 75 | 7 | 7 | 6 | 14 |
| Prosecution unprepared | 21 | 15 | 6 | 15 | |
| Certified for trial | | | | 11 | |
| Undisclosed | 2 | 13 | — | 33 | 26 |
| Total | 98 | 35 | 13 | 65 | 40 |

An affidavit submitted by Defendants relates to the disposition of cases docketed for trial some two weeks after the period covered by Plaintiffs' data. While the intervening time apparently produced some change in the picture, the patterns are consistent; and, as to the crucial elements, Defendants' submission also shows the bulk of the cases delayed or dismissed for want of prosecution.
June 30
 24 cases
 1 nolle prosequi entered
 6 prosecution unprepared (continuance)
 11 dismissed for want of prosecution
 4 accused forfeited collateral by failure to appear for trial
 1 conviction
 1 accused elected to forfeit collateral in open court in lieu of trial
July 1
 12 cases
 4 prosecution unprepared (continued)

 4 accused forfeited collateral by failure to appear for trial
 4 dismissed for want of prosecution

Plaintiffs also stress the hardship to many out-of-town residents, who returned to Washington on their assigned trial dates only to discover that their cases had either been postponed or dismissed. They cite as illustrative instances: A resident of Brooklyn, who was admitted to collateral bond on May 4, returned to the District on June 7, bringing three witnesses with her; thereupon her case was dismissed. Another defendant, whose home was in Pittsburgh, responded to a June 9 trial date only to learn that his case had been put over until July 1; he came to Washington again on July 1 and was told that his case had once again been continued by the Corporation Counsel. A New Orleans resident obliged to return on July 1, was also met with a continuance. This hardship and inconvenience, it is alleged, affected large numbers of persons with respect to whom the prosecut-

ing authorities knew from the outset—or should, upon a good faith review of the evidence, have known—that a *prima facie* case could not be made out.

Defendants represent, on the other hand, that a review of 1,326 cases pending as of June 14 disclosed that only 384 persons had, at the time of their arrest, given addresses outside the Washington metropolitan area. This in turn is subject to offset in that, during interrogation, many of the persons arrested for protest activity may have given the police temporary addresses in the Washington area rather than home addresses in other cities. This may have reflected a natural misunderstanding of what information the police wanted; or may have been influenced by a concern about impact back home or a desire to stress ties to the local community, which would reduce bail required, if any. It is, of course, not our function to resolve such factual questions in the context of the present appeal.

### 3. *Completion of criminal prosecutions.*

When the Plaintiffs filed their original complaint on May 24, 1971, most of the criminal cases arising from the anti-war demonstrations had not yet proceeded to any form of final disposition. The Superior Court's statistics indicate that as of June 2, 1972, 7,346 cases had been filed—2320 cases were filed subsequently—and fewer than three thousand of these had been disposed of. Prosecution of the May Day cases continued throughout the summer of 1971; and the vast majority of case dispositions occurred during this period. By September 22, 1971, when the appeal from the denial of Plaintiffs' request for a preliminary injunction was first heard before this court, the total of cas-

es filed had risen to 9,024; and only 325 of these remained undisposed of in the local courts. By the time of reargument, all charges lodged as a result of the May Day protest activity had reached the final disposition; and the Office of the Corporation Counsel assured this court that no further prosecutions would be instituted.

### C. *Compilation, Maintenance and Dissemination of Arrest Records*

The evidence shows that it was not the general practice of the Metropolitan Police Department to fingerprint or photograph persons who were arrested for petty misdemeanors or violations of municipal ordinances, although booking officers could depart from this policy in individual cases if they felt that the circumstances warranted a fingerprint check to determine whether the person arrested had a prior criminal record or possibly was a fugitive.[30] The Department did, however, make a practice of automatically forwarding copies of all arrest records—together with photographs and fingerprints if these had been obtained—to the Federal Bureau of Investigation's central files. Once these data passed into the FBI's custody, they became subject to dissemination. The pertinent regulations expressly provide FBI exchange of identification records with law enforcement and other governmental agencies (Federal and State) and, indeed, certain private organizations such as banking institutions and railroad police.[31]

As previously noted, the police departed from their usual routine by assembling detailed arrest records, including full photographic and fingerprint records, for disorderly conduct charges during the course of the May Day demonstrations. At the time of the May 3

30. Stipulation by Frederick L. Ruck, Assistant Corporation Counsel of the District of Columbia during hearing on motion for preliminary injunction in Washington Mobilization Committee v. Wilson, (No. C.A. 779–70, May 25, 1971, D.D.C.) at 6, 7. *See* Metropolitan Police De-

partment, General Order, Series 502, Number 1 (March 1, 1972) (fingerprints and photographs not generally taken for disorderly conduct offenses).

31. 28 U.S.C. § 534; 28 C.F.R. § 0.85(b).

arrests, the authorities sought a court order to compel certain of the persons then being held in detention to submit to the booking process. Such an order was issued by the Superior Court; but at the instance of counsel representing the detainees, it was qualified by restrictions upon the use to which the arrest records could be put.[32] Specifically, the final order permitted the taking of fingerprints and photographs and sanctioned their transmission to the FBI; but it required them to be kept in a separate file, provided that they might only be used to determine whether any arrestee was a wanted fugitive, limited their dissemination to law enforcement agencies, and made them subject to recall by the Metropolitan Police Department.

It appears that arrest records and other data were, in fact, transmitted to the FBI's central files. On September 1, 1971, all such documents were recalled and returned to the Washington police, in whose custody they remain at the present time. Apart from providing individuals arrested during the May Day demonstration with copies of their own arrest records, dissemination has been limited to responding to three inquiries made by other police departments through official channels. Consistent with the orders issued by the Superior Court in related litigation, access to these data has been restricted; and Defendants have represented to this court that it will remain so pending final adjudication of the matter presently before us.

### III. ISSUES PENDING BEFORE THIS COURT

Before proceeding further, we must consider what are, and what are not, the questions before us.

On May 3, 1971, when Washington, D. C., was confronted with a threat to bring the orderly conduct of the Federal government to a standstill, the public authorities responded by ordering mass arrests. There was no declaration of martial law. Yet the procedures for requiring that arrests be accompanied by some indication of the basis therefor— even as diluted by the special emergency arrangement permitting the arresting officer to establish probable cause for detention by preparing a simplified field arrest form and photograph—were terminated. The innocent as well as the guilty were in large numbers swept from the streets and placed in detention facilities.

We are not called upon here to consider the validity of emergency measures taken pursuant to congressional statute and Executive Order suspending normal constitutional rights in time of war, as upheld in Korematsu v. United States, 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944). That question, involving a delicate balance between the rights of individuals and the maintenance of public order in a time of extreme crisis, is one of extraordinary complexity for which the guideposts to decision are few and the constitutional significance is great.

■ The action of the police in this case went beyond precautionary measures to ensure public safety by detention, as in *Korematsu*; officials did not merely stop and detain persons who had been on the streets during the May Day demonstrations, they preferred criminal charges against those who had been held in police custody. Even assuming for the sake of discussion that in the May Day emergency conditions police officials had the authority to suspend normal constitutional rights against unlawful arrest and detention—a suspension defendants claim not to have effected here—no legitimate overriding interest of public safety can be served by later booking or prosecuting on criminal charges those who were stopped and detained.

■ In electing to apply the sanctions of the criminal law to those arrested, the public authorities not only sub-

32. District of Columbia v. Approximately Five Hundred Persons (No. CA 4602–71, Superior Ct., May 7, 1971), modified in part (No. 5832, D.C.C.A., June 14, 1971).

jected those whom they accused to the processes of the criminal justice system, but they also bound themselves to follow the rules that govern the conduct of criminal prosecutions. Our task, therefore, is to determine whether members of the plaintiff class—persons arrested for and charged with the commission of criminal offenses—were duly accorded their rights, and, if not, the appropriate relief available in the Federal courts.

Since the matter now comes before us on interlocutory appeal, we do not determine whether Plaintiffs or Defendants are ultimately to prevail in this action. However, our decision that a preliminary injunction is required, requires us to consider the jurisdiction of the District Court and the sufficiency of the complaint. *Cf.* Deckert v. Independence Shares Corp., 311 U.S. 282, 61 S.Ct. 229, 85 L.Ed. 189 (1940); Pang-Tsu Mow v. Republic of China, 91 U.S.App.D.C. 324, 201 F.2d 195 (1952), cert. denied, 345 U.S. 925, 73 S.Ct. 784, 97 L.Ed. 1356 (1953).

## A. *Issues as to Jurisdiction*

### 1. *Basic federal jurisdiction.*

In their complaint, the Plaintiffs assert that their cause of action both arises by virtue of section 1 of the Civil Rights Act of 1871, 42 U.S.C. § 1983, and in the alternative, that it arises directly from the Fourth and Fifth Amendments to the United States Constitution. Jurisdiction of the District Court is said to lie pursuant to 28 U.S.C. §§ 1343 and 1331.[33] It is further al-

leged that the amount in controversy exceeds the sum of $50,000, exclusive of costs. The defendants' answer, filed August 4, 1971, generally denies the jurisdictional averments of the complaint; but the allegation of jurisdictional amount was not contested in the District Court.

The action cannot be maintained under 42 U.S.C. § 1983. The acts complained of are alleged to have been committed by District of Columbia officials under the cloak of public authority. Section 1983 reaches only those who act under color of state or territorial law. In District of Columbia v. Carter, 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973), the Supreme Court held that the phrase "State or Territory," as contained in § 1983, does not include the District of Columbia. It stressed that the District of Columbia is neither a "State" nor a Territory that may be regarded as an inchoate State, but is a unique community established as the seat of the national government.

However, there is Federal jurisdiction to decide the claim, also presented by the complaint, arising under the Constitution of the United States. This claim is neither insubstantial nor frivolous; and it, coupled with the Plaintiffs' allegation of an amount in controversy well in excess of $10,000, is sufficient to invoke the jurisdiction of the federal courts pursuant to 28 U.S.C. § 1331. Bell v. Hood, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946).[34]

---

33. Jurisdiction is also alleged to exist under 28 U.S.C. § 1332 (diversity of citizenship) as well as D.C.Code § 11–501(4) (Supp. V, 1972) (civil actions where the amount in controversy exceeds $50,000). In support of these contentions, it is alleged that the named representatives of the plaintiff class are citizens of states other than the District of Columbia and that the Defendants are residents of the District. We find it unnecessary to consider these alternative bases of jurisdiction in view of our conclusion that federal jurisdiction exists pursuant to 28 U.S.C. § 1331.

34. Perhaps another word, but not much more, should be said concerning jurisdictional amount. Plaintiffs' allegation of amount is not conclusive. The allegation of $50,000 in controversy would have given this court "local" equity jurisdiction even in the absence of a Federal question, a point we do not pursue. Certainly there was sufficient basis to the $10,000 jurisdictional allegation to warrant the court's proceeding with preliminary orders, that in effect have done no more than preserve matters until intelligent decisions, including those respecting jurisdiction, could be made. *See* United States

### 2. *Mootness.*

■ The core of the complaint, as originally filed, was Plaintiffs' prayer for injunctive relief against criminal prosecutions in the Superior Court not conducted in good faith (after screening). Defendants challenged the propriety of such injunctive relief in view of the anti-injunction statute, 28 U.S.C. § 2283, and the policy of abstention announced in Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). These questions were fully briefed and argued when Plaintiffs' first interlocutory appeal was taken on May 26, 1971. Chief Judge Bazelon and Judges Tamm and Wilkey, before whom that appeal was argued, implicitly finding that there was a serious prospect of proceedings by the District of Columbia, not in good faith, which would result in irreparable injury to the members of the plaintiff class, directed temporary injunctive relief prohibiting the Defendants from going forward with these prosecutions until they had taken adequate measures to screen the cases that had been docketed for trial.

These injunctive provisions were retained in the District Court's preliminary injunction, entered on June 23, 1971, and in this court's order of October 1, 1971. Thus, the injunction, requiring the Corporation Counsel to review the evidence in all pending cases before calling them to trial and to dismiss those in which *prima facie* evidence of guilt was lacking, has continued in effect from May 26, 1971, until the present time. During that period, more

than 9,000 cases arising from the May Day demonstrations were processed in the Superior Court. Although the Plaintiffs have produced some evidence that full compliance with the injunction may not have been achieved immediately, Judge Corcoran found as of June 23, 1971, that subsequent to the issuance of the court's restraining order, there had been good faith compliance on the part of the prosecuting authorities.

On June 12, 1972, when Defendants' petition for rehearing was reargued before this court, the Corporation Counsel represented that, as of that date, all criminal cases arising from the 1971 anti-war demonstrations had been closed and that his office would not seek to initiate any further prosecutions. Under these circumstances, it was suggested that the matter of the injunction restraining the Corporation Counsel from proceeding in the Superior Court had become moot. If this fact served to moot the entire controversy it might be appropriate to fashion a dismissal order that closed the docket. However, the controversy remains alive because of the prayers for expungement of arrest records and return of collateral.

The fact that all criminal proceedings in the Superior Court have come to an end does serve, however, to eliminate any possible question concerning the proper application of Younger v. Harris to this case. The rule of *Younger* is no longer an issue in this appeal. *See* Lake Carriers Ass'n v. MacMullan, 406 U.S. 498, 92 S.Ct. 1749, 32 L.Ed.2d 257 (1972). So we need not here consider

---

v. United Mine Workers, 330 U.S. 258, 289–295, 67 S.Ct. 677, 91 L.Ed. 884 (1947). The claims were facially substantial, and the nature of the issues suggested the wisdom of deferring any ultimate determination of jurisdiction pending a grasp of the merits. Defendants did not press for a separate determination of jurisdictional amount, and the court is entitled to defer such questions until the merits. Fed.R.Civ.P. 12(d).

This is certainly not a case where the allegation of jurisdictional amount is so barren as to lack any *prima facie* quality.

The allegations that the individual members of plaintiff class, including the named plaintiffs, had been arrested and seized without probable cause, and then confined for 12 to 14 hours—and there is evidence in the record that the conditions of confinement were overcrowded, unsanitary and oppressive—would stand in' support of $10,000 recovery. We are satisfied that this court has no sound basis at present for denying Federal jurisdiction on the ground of insufficient amount in controversy.

whether *Younger's* emphasis upon federalism and respect for state sovereignty is applicable to the District of Columbia. For the same reason, it is unnecessary to determine whether, in light of District of Columbia v. Carter, *supra,* the District should be regarded as a "state" within the meaning of 28 U.S.C. § 2283.[35]

As to collateral forfeitures, we may pass by the prayer in the complaint that the Defendants be enjoined from declaring forfeit the bond of persons with respect to whom the District of Columbia did not have sufficient evidence of guilt to constitute a *prima facie* case. The cessation of prosecutions obviated additional forfeitures, and this aspect of the dispute was rendered academic. But the complaint also seeks an order requiring the Defendants to refund to members of the plaintiff class those monies that had previously been obtained through the collateral forfeiture process. There is obviously a "live" controversy as to whether Plaintiffs are entitled to this relief.

Similar considerations apply to the Plaintiffs' demand for the expungement of arrest records. These records came into being at the time of the arrests or shortly thereafter, and they remain in existence at the present time. The Plaintiffs contend that these documents, and the prospect of their dissemination, pose a threat of future prejudice because of the social stigma and legal disabilities that attach to an arrest.[36] This threat is not dissipated, or rendered insubstantial or illusory,[37] by the fact that the arrest was not followed by a prosecution. The arrest records remain in existence, in the possession and under the control of the Defendants. This aspect of the case retains its vitality. *Cf.* Sibron v. New York, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968).

3. *Consideration of local remedies.*

In its denial of preliminary relief to require the expungement of arrest records the District Court ruled that the motion had been prematurely made, and that local remedies must be exhausted before such relief is sought in a Federal court. We assume the court intended the same ruling as to Plaintiffs' demand for the restitution of forfeited collateral.

---

35. In District of Columbia v. Carter, decided January 10, 1973, the Supreme Court held that the District of Columbia, though a "State" for purposes of 42 U.S.C. § 1982, is not a "State" within the meaning of 42 U.S.C. § 1983. The Court said that the District of Columbia has "unique status"—"unlike . . . the States . . . [it] is truly *sui generis* in our governmental structure"—and whether in any particular context it is to be considered as a State depends on a careful analysis of that context.

It may well be that the abstention doctrine is rooted in federalism interests which—with all their historic underpinnings, the tension between federal powers and state sovereignty, and the concern for local political autonomy—make the abstention doctrine inapposite in the unique District. It may be that, in defining the relationship between the local and Federal courts within the District, cases articulating the doctrine of abstention in the context of a Federal-state relationship are instructive, but not necessarily controlling. On the other hand it may be that, in enacting the District of Columbia Court Reorganization Act of 1970, Congress intended a relationship between the Federal courts and the local statutory courts of the District to be patterned in full measure on the relationship between Federal and state tribunals in other parts of the country. Whether Congress did so intend is an unresolved question.

These are matters that will likely require future inquiry and reflection. No such inquiry is required for the case at bar. This case was briefed and argued on the supposition that the general doctrine of Federal abstention might be applicable with full force within the District of Columbia. Finding as we do that, even as measured by this stringent yardstick, abstention would be inappropriate on the facts of this case, we have not found it necessary to consider whether a lesser or different doctrine defines the relationship between Federal and local courts in the District; and we intimate no view on this question.

36. See discussion at page 970, *infra.*

37. *Compare, e. g.,* Newell v. Ignatius, 132 U.S.App.D.C. 252, 407 F.2d 715 (1969) *with* Finley v. Hampton, 154 U.S.App. D.C. 50, 473 F.2d 180 (1972).

■ Plaintiffs bring this action alleging a deprivation of rights secured by the Constitution. This deprivation is said to arise from the conduct of District officers, acting under color of law. Their cause of action is Federal in nature. There is undoubted jurisdiction in the Federal courts to entertain actions to enforce Federal constitutional rights. Bivens v. Six Unknown Named Agents, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).[38] That such actions are also maintainable in state courts, or in the local courts of the District of Columbia, does not foreclose access to the Federal courts, or require prior exhaustion of such State or local remedy. This is plain from *Bivens,* and other settled Supreme Court authority.[39]

■ This general rule is subject to certain exceptions, with the precedents establishing that under certain circumstances, parties must resort to a state's administrative or judicial machinery before proceeding in a Federal forum.[40] Thus, they established the judicial rule, later codified,[41] that limits the availability of Federal habeas corpus when equivalent relief may be available from the state courts. Another prominent doctrine provides for Federal abstention when the case may hinge upon unresolved issues of state law.[42] But the case at bar does not involve the extraordinary relief of habeas corpus, nor does it turn upon complex issues of local law.

■ Moreover, the exhaustion of local remedies doctrine is appropriate, as a reason for denial of Federal relief, only when there has been a failure to utilize state remedial channels that are both accessible and capable of affording a full measure of relief.[43] In Spock v. District of Columbia, 283 A.2d 14 (D.C. App.1971), a common law action, the District of Columbia Court of Appeals held that neither it nor the other local courts of the District had jurisdiction to order the expungement of police records; and it limited relief to an "amplification" of arrest records to reflect the fact of acquittal. In view of Plaintiffs' claim that a more complete remedy is required to vindicate their Federal constitutional rights, the exhaustion doctrine does not preclude access to the Federal court.

■ As to Plaintiffs' claim of entitlement to the relief of setting aside a forfeiture of collateral security, the remedy available in the courts of the District of Columbia requires that the request be made within 90 days of the date of forfeiture.[44] Federal relief may be withheld from persons who have "deliberately bypassed the orderly procedure of the state courts." *See* Fay v. Noia, 372 U.S. 391, 438, 83 S.Ct. 822, 849, 9 L.Ed.2d 837 (1963). But a significant element of the Plaintiffs' complaint is the assertion that, because of misinformation circulated to the arres-

---

38. *Bivens* was cited in District of Columbia v. Carter as supporting Federal jurisdiction of an action against persons appointed, pursuant to authority granted by Congress, as employees of the District of Columbia, who exercise their official authority to contravene Federal constitutional rights.

39. *See* Monroe v. Pape, 365 U.S. 167, 183, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961); Wilwording v. Swenson, 404 U.S. 249, 251, 92 S.Ct. 407, 30 L.Ed.2d 418 (1971).

40. Again, we do not purport to decide the extent to which these precedents are pertinent to the special circumstance of the District. See note 35 *supra.*

41. *E. g.,* Ex parte Royall, 117 U.S. 241, 6 S.Ct. 734, 29 L.Ed.2d 868 (1886);

Mooney v. Holohan, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935). See 28 U.S.C. § 2254(b).

42. *E. g.,* Railroad Comm. v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941); Askew v. Hargrave, 401 U.S. 476, 91 S.Ct. 856, 28 L.Ed.2d 196 (1971).

43. Fay v. Noia, 372 U.S. 391, 434–435, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963); Young v. Ragen, 337 U.S. 235, 238–239, 69 S.Ct. 1073, 93 L.Ed. 1333 (1949); Cotner v. Henry, 394 F.2d 873 (7th Cir.), cert. denied, 393 U.S. 847, 89 S.Ct. 132, 21 L. Ed.2d 118 (1968). *See* Brown v. Allen, 344 U.S. 443, 448–449 & n. 3, 73 S.Ct. 397, 97 L.Ed. 469 (1953).

44. Criminal Rule 35(b), D.C. Superior Court Rules (1971).

tees at the time they posted bond, large numbers of them were frustrated—either deliberately or unintentionally—in their efforts to secure procedural due process with respect to the forfeitures of collateral. There is at least serious doubt of the availability of relief in the District of Columbia courts.

Since, as Judge Corcoran found and we agree, the present action is an appropriate mechanism for securing relief to the class as a whole, the combination of the different elements of the complaint, and prayers pertinent thereto, which all arise from a "common nucleus of operative facts," avoids splintering what is essentially a unitary cause of action into separate Federal and local suits. *Cf.* United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); Hurn v. Oursler, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148 (1933).

### 3. *Ripeness.*

The prayers for expungement of arrest records, and return of collateral, were dependent on a prior determination, either the discontinuance of prosecution, or an acquittal.[45]

Yet Plaintiffs' motion for expungement was made at a time when the vast majority of criminal cases arising from the May Day arrests were still pending in the D.C. Superior Court and when the criminal liability of the individual arrestees had not been determined. While Plaintiffs' motion for expungement of arrest records did not fully ripen until the local criminal proceedings had been brought to a conclusion, they were entitled to press a provisional claim, prohibiting dissemination of the arrest records meanwhile.

■ This court's order of October 1, 1971, merely directed that the Defendants be enjoined from disseminating the police records that pertained to members of the plaintiff class and that they be required to call back any copies of the records theretofore transmitted to other law enforcement agencies. It preserved the status quo, preventing immediate injury to the Plaintiffs until such time as their suit for expungement could be determined on the merits. This course is entirely proper and it is one of the basic purposes of a preliminary injunction. *E. g.*, District 50, United Mine Workers v. International Union, U.M.W., 134 U.S. App.D.C. 34, 37, 412 F.2d 165, 168 (1969); 7 J. Moore, Federal Practice, ¶65.04[1].

■ With the termination of prosecutions arising from the May Day demonstrations, any impediments to Federal consideration of Plaintiffs' request for expungement were removed. Any danger of embarrassment or interference from judgments possibly inconsistent with those of the Superior Court was obviated, and the facts surrounding local proceeding had sufficiently "jelled" to present a clear-cut federal controversy. *Compare* Abbott Laboratories, Inc. v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967) *with* United Public Workers v. Mitchell, 330 U.S. 75, 67 S. Ct. 556, 91 L.Ed. 754 (1947).

### B. *Substantive Issues and Appropriate Remedies*

Defendants contend that Plaintiffs' cause cannot be maintained in any event and that, for this reason, this court should dissolve its orders and order dismissal of the proceedings. In the interest of justice and efficiency in judicial

---

45. Plaintiffs did not claim to be entitled to seek relief in any case where a prosecution was maintainable, bona fide, after screening. We are aware of the rulings that an action under 42 U.S.C. § 1983, seeking damages for an illegal arrest, is not precluded by a subsequent criminal conviction, unless the validity of the arrest was necessarily determined in the criminal proceeding. Kauffman v. Moss, 420 F.2d

1270 (3d Cir.), cert. denied, 400 U.S. 846, 91 S.Ct. 93, 27 L.Ed.2d 84 (1970). *See* Basista v. Weir, 340 F.2d 74, 81–82 (3d Cir., 1965); Mulligan v. Schlachter, 389 F.2d 231 (6th Cir., 1968). However, as will appear in later discussion, there may be reason for preserving police records in any case where there is substantial evidence of guilt in fact.

administration we consider the most salient aspects, in the context of this appeal, of the contention that Plaintiffs' complaint fails to state a claim upon which relief can be granted.[46]

The Federal courts have not only jurisdiction to hear and determine claims of deprivation and threatened deprivation of rights guaranteed by the Fourth and Fifth Amendments but also judicial authority to use their remedial mechanisms to redress or obviate such constitutional injuries.[47]

The Fourth Amendment's prohibition against unreasonable searches and seizures demands that probable cause exist as the *sine qua non* of a lawful arrest. Only upon a showing of probable cause may an arrest warrant properly be issued.[48] Similarly, when local statutes give a police officer authority to arrest without a warrant, he must at the time of the arrest have sufficient reliable information to satisfy the probable cause requirement.[49] The limits that the Fourth Amendment imposes upon police conduct are well-established. Should these limits be exceeded, the arresting officer may be liable for damages under the Civil Rights Act[50] or in a federal common law action arising under the amendment itself.[51] Moreover, in the exceptional case where there is a serious threat of future Fourth Amendment violations, an injunction may lie to prohibit further police misconduct.[52] The question arises whether the particular relief sought by Plaintiffs may be granted.

46. Subject of course to renewal of the motion before the District Court on other grounds following remand. *See* Deckert v. Independence Shares Corp., 311 U.S. 282, 286–287, 61 S.Ct. 229, 85 L.Ed. 189 (1940) ; Mast, Foos & Co. v. Stover Mfg. Co., 177 U.S. 485, 494–495, 20 S.Ct. 708, 44 L.Ed. 856 (1900) ; Hurwitz v. Directors Guild, Inc., 364 F.2d 67, 69–70 (2d Cir.), cert. denied, 385 U.S. 971, 87 S.Ct. 508, 17 L.Ed.2d 435 (1966).

47. In Bivens v. Six Unknown Named Agents, *supra*, the Supreme Court held that an action for damages, arising under the Fourth Amendment, lay against Federal narcotics officers who had allegedly broken into the plaintiff's apartment without a warrant, searched it, arrested the plaintiff, and subjected him to unreasonable physical force—all without probable cause to believe that he was engaged in criminal activity. Relying on *Bivens*, the Sixth Circuit recently intimated that FBI agents who had purportedly executed perjured affidavits to support a warrant for plaintiff's arrest could be held liable for money damages in a suit analogous to a common law action for false arrest and malicious prosecution. Jones v. Perrigan, 459 F.2d 81 (6th Cir., 1972). In Bethea v. Reid, 445 F.2d 1163 (3d Cir., 1971), cert. denied, 404 U.S. 1061, 92 S.Ct. 747, 30 L.Ed.2d 749 (1972), an action for damages was held to lie against Federal officers who had allegedly conspired to violate the Fourth and Fifth Amendment rights of the plaintiff by unlawfully seizing certain of his property and knowingly using perjured testimony to secure his conviction on a charge of bank robbery. Similarly, in a suit alleging abridgement of Fifth Amendment rights by the falsification of documentary evidence and perjury, a cause of action for both money damages and injunctive relief was held to lie. United States ex rel. Moore v. Koelzer, 457 F.2d 892 (3d Cir., 1972).

48. *See, e. g.*, Giordenello v. United States, 357 U.S. 480, 485–487, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958).

49. Beck v. Ohio, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964) ; Henry v. United States, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed. 2d 134 (1959) ; Pendergrast v. United States, 135 U.S.App.D.C. 20, 27–28, 416 F.2d 776, 783–784, cert. denied, 395 U.S. 926, 89 S.Ct. 1782, 23 L.Ed.2d 243 (1969).

50. *E. g.*, Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). *See* Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967).

51. Bivens v. Six Unknown Named Agents, *supra*.

52. Lankford v. Gelston, 364 F.2d 197 (4th Cir. 1966) ; Gomez v. Wilson, 323 F. Supp. 87 (D.D.C.1971), remanded for further proceedings, 139 U.S.App.D.C. 122, 430 F.2d 495 (1973). See Note, The Federal Injunction as a Remedy for Unconstitutional Police Conduct, 78 Yale L.J. 143 (1968). *But cf.* Long v. District of Columbia, 152 U.S.App.D.C. 187, 469 F.2d 927 (1972).

█ █ The Fourth Amendment establishes a principle of reason under which the individual's privacy and freedom from official interference must be weighed against society's need for effective law enforcement.[53] This balancing underlies both judicial evaluation of the circumstances under which an arrest was made and the relief that a court may provide in consequence of a tainted arrest. The mere fact that a Fourth Amendment violation has occurred does not create an immunity from prosecution,[54] deprive the trial court of jurisdiction,[55] or require the exclusion of evidence acquired by lawful means, remote from the illegal detention.[56]

█ Assuming a determination of constitutional violations, it is undeniable that the Federal courts having subject-matter jurisdiction also have broad equitable power to remedy and obviate all traces of the constitutional wrong. In discussing the "historic equitable remedial powers" of the courts, to fashion "equitable remedies to repair the denial of a constitutional right," Chief Justice Burger, speaking for a unanimous Court, pointed out, Swann v. Board of Education, 402 U.S. 1, 15, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971):

> Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies.

The Court reiterated, with approval, the principle set forth in Hecht Co. v. Bowles, 321 U.S. 321, 329, 64 S.Ct. 587, 592, 88 L.Ed. 754 (1944):

> The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it. The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims.

And Swann expressly approved the equitable principle that "the nature of the violation determines the scope of the remedy." 402 U.S. at 16, 91 S.Ct. at 1276.

Subsequent to Swann the Court reiterated, in Bivens v. Six Unknown Named Agents, 403 U.S. at 392, 91 S.Ct. at 2002, that "where federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief." (Citing Bell v. Hood, supra, 327 U.S. at 684, 66 S.Ct. 773.)

In the light of these principles we turn to a more detailed consideration of the nature of the constitutional violation and the appropriate scope of remedy.

1. *Validity of the arrests.*

█ This case presents, in the form of a class action, a broad scale challenge to the validity of arrests made during the most critical period of the 1971 May Day demonstrations. Generally, the issue of probable cause for an arrest is a highly individual matter, depending both upon the specific objective conduct of

53. See Terry v. Ohio, 392 U.S. 1, 20–22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); Camara v. Municipal Court, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967).

54. See, e. g., United States v. Hoffman, 385 F.2d 501 (7th Cir. 1967), cert. denied, 390 U.S. 1031, 88 S.Ct. 1424, 20 L.Ed.2d 288 (1968). Pennsylvania ex rel. Craig v. Maroney, 348 F.2d 22 (3d Cir. 1965), cert. denied, 384 U.S. 1019, 86 S. Ct. 1966, 16 L.Ed.2d 1042 (1966).

55. Frisbie v. Collins, 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952).

56. Compare Bynum v. United States, 107 U.S.App.D.C. 109, 274 F.2d 767 (1960), cert. denied, 379 U.S. 908, 85 S.Ct. 202, 13 L.Ed.2d 180 (1964), with Bynum v. United States, 104 U.S.App.D.C. 368, 262 F.2d 465 (1958). See Wong Sun v. United States, 371 U.S. 471, 487–488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); Pennsylvania ex rel. Craig v. Maroney, supra.

the particular arrestee at the time of his apprehension and upon the state of knowledge and reasonable belief of the arresting officer. *See, e. g.,* Adams v. Williams, 407 U.S. 143, 148–149, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). Ordinarily, therefore, we would have serious misgivings concerning any effort to litigate the validity of several thousand separate arrests through the mechanism of a class action.

In the present case, however, we are confronted by a situation in which the police did not govern themselves by their ordinary procedures, which are calculated to guard against an arrest without probable cause, even in the case of a massive civil disturbance.[57] And the arrests that were made were the product of a common course of conduct by the police.

During May, 1971, and particularly on May 3, police officials laid primary emphasis upon mass arrests as a means of clearing the streets. The premise of the legal system, that unlawful arrests can be avoided or remedied by holding individual policemen accountable, evaporated when field arrest procedures were suspended and when persons other than arresting officers were permitted to execute field arrest forms. This lack of accountability was heightened by the fact that officers appeared on duty without customary name tags or numbered badges, which likewise precluded complaints to departmental superiors. Since the disorderly conduct and other offenses charged did not involve tangible evidence, implements or fruits, the exclusionary rule evolved by the courts to restrain unlawful arrests had no meaningful pertinence or influence.

In view of the circumstances and considerations described, the protection of Fourth Amendment rights warrants not only the remedy of a class action to test the validity of the arrests made during the critical May, 1971, period in connection with the anti-war demonstrations but also a declaration, as a legal principle corollary to the Fourth Amendment's protection, that holds presumptively invalid any arrest that was not accompanied by a contemporaneous Polaroid photograph and field arrest form executed by one who was in fact the arresting officer, this presumption being of course subject to rebuttal upon an affirmative showing by Defendants that any particular arrest was based upon probable cause.[58]

---

57. The Committee on the Administration of Justice Under Emergency Conditions has recommended that field arrest procedures be suspended only as a last resort "in those extreme circumstances where, but for the suspension, loss of life or serious bodily harm would result." In making this recommendation, the Committee observed, 1973 Report, *supra* note 13, at 134:

[S]uspension of the evidence-recording requirement as a reaction to disorder is qualitatively different from . . . lesser responses . . . . Those lesser responses, even including the arrest of large numbers of persons under established field arrest procedures, may encumber the criminal justice system, but the system still remains operative as the framework within which the resolution of the disorder and the cases it produces ultimately occurs. However, when large-scale arrests are unaccompanied by documentation, this kind of resolution may be precluded and the judicial process obviated. The sanctions meted out become those of arrest and detention, not conviction and punishment. The imprimatur of the community necessary to legitimize these sanctions, normally expressed through the institutions of the judicial process, instead is bestowed by the police.

58. Since the police files themselves will indicate the presence or absence of the critical arrest form and photograph, we anticipate little difficulty—apart from the mechanical chore of culling these records —in identifying the members of the class to whom this presumption applies. We emphasize again that class relief is the very essence of this action. While it is open to the Defendants to show that particular individuals are not properly included within the class, the burden of identifying them and showing the basis for their exclusion rests upon the Defendants. See notes 74 & 75 *infra* and accompanying text.

2. *Arrest records.*

█ The principle is well established that a court may order the expungement of records, including arrest records, when that remedy is necessary and appropriate in order to preserve basic legal rights. That principle has been applied by this court on several prior occasions. While various cases are distinguishable on the facts, they illustrate the vitality of the principle. The propriety of expungement relief was discussed explicitly by this court in Morrow v. District of Columbia,[59] Menard v. Mitchell,[60] and Newell v. Ignatius.[61] It is also supported by action taken by the Supreme Court.[62]

█ Our rulings on expungement are in accordance with the rulings of other Federal courts ordering the expungement of local arrest records as an appropriate remedy in the wake of police action in violation of constitutional rights.

In United States v. McLeod,[63] an action brought by the Attorney General pursuant to 42 U.S.C. § 1971(b), local officials were ordered both to expunge the arrest records of and to return the fines collected from a group of civil rights workers who had been arrested, and indeed convicted by the state courts, in an effort to disrupt a voter registraion drive.

The expungement of municipal arrest records was also ordered in Wheeler v. Goodman,[64] upon a showing that police had committed repeated Fourth Amendment violations while enforcing a state vagrancy law that the court found unconstitutionally overbroad.[65]

In Hughes v. Rizzo,[66] suit was brought in the wake of a campaign by local police to discourage youths who might generally be described as members of the "hippie" cult from congregating in a public park. The device employed was to arrest en masse persons

59. 135 U.S.App.D.C. 160, 417 F.2d 728 (1969). Our decision was limited to the issue of whether the Superior Court had jurisdiction to order the expungement of arrest records; and we expressly refrained from rendering a decision on the merits, leaving this matter to the District of Columbia Court of Appeals. On remand, the D.C.C.A. held that limiting the dissemination of the records afforded plaintiff sufficient relief, absent "unusual facts;" and it ordered the Superior Court to vacate its expungement order. In re Alexander, 259 A.2d 592 (1969).

The *Morrow* case dates from the time, prior to the Court Reorganization Act of 1970, when this court was charged with responsibility for supervising the District's system of local courts, and the substantive rights there asserted arose by virtue of local law, rather than under the Constitution. The D.C.C.A., exercising its independent authority in the wake of the Court Reform Act, overruled *Morrow* in Spock v. District of Columbia, 283 A. 2d 14 (D.C.App.1971).

60. 139 U.S.App.D.C. 113, 430 F.2d 486 (1970). We will advert to *Menard* only briefly, since our initial decision was on appeal from a motion to dismiss the complaint. The merits of the case were argued in full this term, and the matter is presently *sub judice*.

61. 132 U.S.App.D.C. 252, 407 F.2d 715 (1969).

62. *See* Peters v. Hobby, 349 U.S. 331, 348–349, 75 S.Ct. 790, 99 L.Ed. 1129 (1955), in which the Supreme Court ordered the expungement from a federal employee's personnel records of findings made by the Loyalty Review Board in response to a showing that the Board had acted without jurisdiction. *Cf.* Taylor v. McElroy, 360 U.S. 709, 79 S.Ct. 1428, 3 L.Ed.2d 1528 (1959) (cert. petition treated as moot where Government restored security clearance and voluntarily expunged findings of disloyalty from personnel records).

63. 385 F.2d 734 (5th Cir. 1967).

64. 306 F.Supp. 58 (W.D.N.C.1969) (three-judge court).

65. The Supreme Court subsequently vacated the order and remanded the case for reconsideration, 401 U.S. 987, 91 S.Ct. 1219, 28 L.Ed.2d 524 (1971), in light of its decision in Younger v. Harris. This development is, of course, relevant only insofar as the lower court's decision rested on a finding that the state vagrancy statute was facially unconstitutional and its remedy included an injunction against state prosecutions.

66. 282 F.Supp. 881 (E.D.Pa.1968).

whom the police deemed undesirable elements, to transport them to police stationhouses where they were questioned and photographed, and then to release them without instituting criminal prosecutions. The Federal court, finding clear violations of constitutional rights, directed that all records of the arrests be expunged, ordered the photographs taken to be destroyed or returned to the arrestees, and retained jurisdiction to afford further relief in the event it should become necessary.[67]

In Kowall v. United States, 53 F.R.D. 211 (W.D.Mich., 1971), petitioner had been convicted of failing to report for induction into the armed services and had been sentenced to a term of imprisonment. In an action for relief under 28 U.S.C. § 2255, his conviction was set aside, and he was ordered released from confinement when it appeared that the action of his Selective Service Board in declaring him delinquent was invalid under Gutknecht v. United States, 396 U.S. 295, 90 S.Ct. 506, 24 L.Ed.2d 532 (1970). The court also ordered federal authorities to expunge all records relating to petitioner's arrest, holding that "the logic of the . . . law of remedies does not set arbitrary limits on a federal court's jurisdiction to right wrongs cognizable by the common law within the jurisdiction of the court," 53 F.R.D. at 213, and finding no persuasive justification in public policy for the retention of the records.

■ Turning to the case at bar, we note that the police records against which relief is sought are the direct product of the arrests at issue. The process of preparing arrest records was so structured as to be devoid of the kind of intervening procedures, through which the facts surrounding the alleged misconduct could be verified, that normally provide protection against arrest records made without basis in fact. Yet the very presence of these records carries the strong implication that the underlying arrest and detention were somehow justified.[68] To the extent that the action of the police officer calling for the arrest reflected considerations other than bringing lawbreakers to book, the inference that would naturally be drawn from these records is unwarranted.

■ Moreover, the records consist in part of photographs and fingerprints taken of arrestees while they were being held in detention. Whatever the possible justification for these tools of identification in apprehending fugitives, and in coping with the problems of offenders who refused to identify themselves, the record strongly supports the conclusion that these particular photographs were intended to be used—as they were in fact employed—in an effort to secure evidence of guilt. The booking photographs were shown to policemen in a "rogues gallery" presentation on the days immediately following the mass arrests so as to elicit testimony for use at trial. In a situation where the arrest itself is supported by probable cause and basic procedural requirements have been observed, garnering such evidence during the course of detention is entirely permissible. But an altogether different question is raised when, as here, the police could not have furnished evidence of probable cause if a judicial hearing had been held promptly after apprehension.

---

**67.** We have also considered certain other cases in which either state or federal courts ordered the expungement of arrest records on other grounds. Certain of these have been based upon improper use or dissemination of the records to unauthorized persons. *See, e. g.,* Itzkovitch v. Whitaker, 115 La. 479, 39 So. 499 (1905) ; Schulman v. Whitaker, 117 La. 704, 42 So. 227 (1906) ; State ex rel. Reed v. Harris, 348 Mo. 426, 153 S.W.2d 834 (1941). Others have been founded upon the theory that retention and dissemination of police records violates the individual's right to privacy. See Davidson v. Dill, Colo., 503 P.2d 157 (1972) ; Eddy v. Moore, 5 Wash.App. 334, 487 P.2d 211 (1971).

**68.** *See* Menard v. Mitchell, 139 U.S.App. D.C. at 118 & n. 24, 430 F.2d at 491 & n. 24.

The practice of making dragnet arrests to secure physical evidence linking a particular individual with a known crime was vehemently condemned by the Supreme Court in Davis v. Mississippi, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969). Similarly, the Constitution does not permit arrests at the scene of a demonstration, without cause at the time of arrest, in the hope that evidence uncovered during the process of detention may serve as the basis for prosecuting at least some of those arrested.[69]

The adverse personal consequences that may flow from the existence of an arrest record were developed in our opinion in Menard v. Mitchell.[70] The additional impact that may result when such records are disseminated to other institutions, both public and private, were noted by this court in Morrow v. District of Columbia[71] and by the District Court following our remand in Menard.[72] These injuries and dangers are plain enough. We see no need to enlarge the already ample discussion in our earlier opinions.

We assume, for present purposes, that Plaintiffs' right to expungement of the arrest record of a person arrested without probable cause, under the circumstances related, may be qualified if detention of the person involved is justified by information developed subsequent to the arrest and without reliance on uses of a detention without probable cause. Menard v. Mitchell, 139 U.S. App.D.C. at 118–119, 430 F.2d at 491–492.

But in the case at bar any legitimate public interest in these records is severely undermined by the fact that they are the product of an arrest procedure that was not rooted in probable cause determinations.[73] While some, maybe most, of the persons taken into police custody during the May Day demonstrations may have been engaged in criminal activity, it appears that many others were innocent of any wrongdoing. Yet the arrest procedures used and the subsequent treatment of the arrestees during the course of their detention made it impossible to distinguish between the two classes.

 It is a well-settled legal doctrine that in situations in which the defendant has by his own actions so muddled the evidence that it is impossible for the plaintiffs to adduce those particular facts that would normally be pleaded in support of his action, the burden of proof is shifted from plaintiff to defendant to come forward with the pertinent evidence.[74]

---

69. *See* United States v. Edmons, 432 F.2d 577 (2d Cir., 1970) (per Friendly, J.); Barnett v. D'Artois, 331 F.Supp. 1310, 1318–1319 (W.D.La., 1971). *Cf.* Bynum v. United States, 104 U.S.App.D.C. 368, 262 F.2d 465 (1958).

70. 139 U.S.App.D.C. at 117–118, 430 F.2d at 490–491.

71. 135 U.S.App.D.C. at 174, 177–178, 417 F.2d at 742, 745–746.

72. 328 F.Supp. 718, at 720–723, 726–727 (D.C.).

73. *See* 1973 Report, *supra* note 13, at 193: Photographic and fingerprint identification procedures may be of assistance to law enforcement authorities to prove the case against the arrested person, to locate the person in the event he does not appear for court as required, or to keep track of his criminal record, if conviction occurs. Where the likelihood of prosecution following arrest is min-imal, however, as where the field arrest procedure has been suspended, these identification procedures serve none of the foregoing interests. Accordingly, the committee believes that persons arrested under emergency conditions, at a time and place where the field arrest procedure has been suspended, should not be required to submit to photographic and fingerprint identification processing.

74. A person who wrongfully takes another's goods and commingles them with his own has the burden of identifying that part of the combined lot that belongs specifically to him, on pain of being held liable for the whole. *See, e. g.,* Vest v. Bond Bros., 223 Ala. 552, 137 So. 392 (1931); Lightner Mining Co. v. Lane, 161 Cal. 689, 120 P. 771, 779 (1912); Gurney v. Tenney, 226 Mass. 277, 115 N.E. 313 (1917) (per Rugg, C. J.); Troop v. St. Louis Union Trust Co., 25 Ill.App.2d 143, 166

We conclude, in the unusual circumstances presented by the case at bar, that in an action to remedy the denial of a constitutional right, the Federal court's broad and flexible equitable powers call for an order that limits the maintenance and dissemination of the arrest records, and of all materials obtained from persons taken into custody during the May Day protest, in the absence of affirmative evidence produced by the Defendants to demonstrate the existence of probable cause either at the time of the arrest or subsequent thereto.

■ Our ruling is not only responsive to the factual context of this case, but is also a corollary to the well-established principle that, when the public authorities take action that must stand or fall on the basis of an underlying arrest and when the validity of that arrest is ·questioned in an appropriate proceeding, the burden of establishing probable cause rests entirely upon the Government.[75]

■ There remains the matter of considering the specific form in which relief may be provided. Plaintiffs contend that nothing short of outright expungement will suffice to insure an adequate remedy. Defendants, on the other hand, argue that the remedy of expungement is foreclosed by section 4–137 of the District of Columbia Code, which provides:

All records of the Metropolitan Police force shall be preserved, except that the Board of Commissioners, upon recommendation of the major and superintendent of police, may cause records which it considers to be obso-

---

N.E.2d 116, 123 (1960) (Ill.Supreme Ct. review denied). *See*, R. Brown, Personal Property, 71–76 (2d ed. 1955) ; 1 Am.Jur. 2d Accession & Confusion § 24, at 292; 15A C.J.S. Confusion of Goods § 12 at 559 n. 16.5. The rule derives from the ancient doctrine of the law of trusts where the burden is placed on a commingling trustee to distinguish his own property from that of the trust; and all questions of doubt are resolved against him. Richardson v. Van Auken, 5 App.D.C. 209 (1895) ; Hardy v. Hardy, 235 F.Supp. 208 (D.D.C., 1964) ; 2 A. Scott, Trusts § 172; 1 Restatement 2d Trusts § 172, comment b.

The vitality of the principle, and its application to new and modern problems, is exemplified by rulings in labor relations cases. Where management coupled punitive discharges—unlawful under the National Labor Relations Act—with discharges necessitated by business exigencies or supported by adequate cause, "[the employer's] conduct has made it impossible to identify," F. W. Woolworth Co. v. N.L.R.B., 121 F.2d 658, 662 (2d Cir. 1941), those who were the victims of discriminatory discharges. The court ordered apportionment of new job openings on a pro rata basis between union and nonunion employees and placed on the employer all risk of uncertainty in their identification. *Id.* The same general principle has been applied to apportioning back pay awards to employees who were illegally discharged. NLRB v. Tjidee

Prods. Co., 138 U.S.App.D.C. 249, 257–258, 426 F.2d 1243, 1251–1252 (1970) ; NLRB v. Kartarik, Inc., 227 F.2d 190 (8th Cir., 1955).

In Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946), an employer who compounded his violation of the Fair Labor Standards Act by his failure to keep accurate time records was required to pay in compensation an amount based solely on the rough approximations of the plaintiff employees in the absence of a showing by the employer that the inference to be drawn from the employees' testimony was unreasonable.

Under the antitrust laws where the conduct of the defendant has brought about a restraint of trade and has also made it impossible for the plaintiff to prove the extent of his loss with any precision, the court will place all risk of uncertainty upon the defendant. Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 563–566, 51 S.Ct. 248, 75 L.Ed. 544 (1931) ; Bigelow v. R.K.O. Radio Pictures, Inc., 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946).

75. Wrightson v. United States, 95 U.S.App. D.C. 390, 222 F.2d 556 (1955). *See* Beck v. Ohio *supra*; Ker v. California, 374 U.S. 23, 34–37, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963) ; Von Sleichter v. United States, 153 U.S.App.D.C. 169, 472 F.2d 1244, cert. denied, 409 U.S. 1063, 93 S.Ct. 555, 34 L.Ed.2d 517 (1972).

lete or of no further value to be destroyed.

In Spock v. District of Columbia, *supra*, the District of Columbia Court of Appeals held that, in view of section 4–137, courts sitting in the District of Columbia lacked jurisdiction to order the expungement of arrest records. Defendants assert that the rule of *Spock* governs this court by virtue of Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188.[76] This contention is not sound.

■ Plaintiffs allege infringement of rights constitutional in origin (Fourth and Fifth Amendments). The means of redress are Federal, and vindication is being sought in a Federal forum. Under these circumstances, the *Erie* doctrine is wholly inapplicable; and all elements of the action are governed by Federal law.[77] In an action to enforce Federal rights it is Federal law —not state common law—that controls such critical matters as the scope of relief,[78] just as it controls the maintainability of the action against a defense of immunity[79] or expiration with plaintiff's death.[80] Where there is an infringement of constitutional rights the Federal courts must be guided by the need for an effective remedy, and are not constrained by the "state law" of the jurisdiction where the acts took place.

Bivens v. Six Unknown Named Agents, *supra*.

■ We are aware, of course, that section 4–137 of the District of Columbia Code is an enactment of Congress, rather than that of a state legislature. But once the *Erie* doctrine is seen to be inapplicable, we must decide the Federal question whether this was intended to limit the remedial jurisdiction of the Federal courts, and we see no basis for discerning such a result—in a way that could not be achieved in the several states—from a local housekeeping measure.

■ D.C.Code § 4–137 was enacted on June 29, 1953, as part of a general revision of police recordkeeping procedures. The prior provision, in effect since the 1878 District of Columbia Revised Statutes, was as follows:

> The Board of Commissioners shall also cause to be kept and bound all police returns and reports of the District.[81]

The sole reference to the reason for the 1953 change is the brief notation in the committee reports that:

> The amendment . . . permits the District Commissioners, on recommendation by the Chief of Police, to destroy obsolete and valueless records.[82]

**76.** The D.C.C.A. itself as much as suggested this result. *See* 283 A.2d n. 18 at 21.

**77.** *See* Anderson v. Haas, 341 F.2d 497 (3d Cir., 1965); Pritchard v. Smith, 289 F.2d 153 (8th Cir., 1961); Beyer v. Werner, 299 F.Supp. 967 (E.D.N.Y., 1969); 1A J. Moore, Federal Practice ¶s 0.323 [1], [3], 0.328 (1971); C. Wright, Federal Courts § 60 at 251–53 (2d ed. 1970); H. Hart & H. Wechsler, The Federal Courts and the Federal System 691–708 (1st ed., 1953); *Id.* 787–806, 825–32 (2d ed., 1973). *Cf.* Holmberg v. Ambrecht, 327 U.S. 392, 66 S.Ct. 582, 90 L.Ed. 743 (1946); Sola Electric Co. v. Jefferson Electric Co., 317 U.S. 173, 63 S.Ct. 172, 87 L.Ed. 165 (1942).

**78.** *See*, Basista v. Weir, 340 F.2d 74, 86–88 (3d Cir. 1965). *Cf.* Sullivan v. Little

Hunting Park, 396 U.S. 229, 238–240, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969) (suit under 42 U.S.C. § 1982).

**79.** *See* Bivens v. Six Unknown Named Agents, 456 F.2d 1339 (2d Cir., 1972) (decision on remand, per Medina, J.); Bethea v. Reid, 445 F.2d 1163 (3d Cir. 1971), cert. denied, 404 U.S. 1061, 92 S.Ct. 747, 30 L.Ed.2d 749 (1972). *Cf.* Nelson v. Knox, 256 F.2d 312 (6th Cir., 1958).

**80.** *See* Pritchard v. Smith, 289 F.2d 153 (8th Cir. 1961).

**81.** 90 D.C.Revised Statutes § 390 (1878).

**82.** H.R.Rep.No.514, 83d Cong., 1st Sess., 1953, at 10; S.Rep.No.364, 83d Cong., 1st Sess., 1953, at 10.

We think it plain that this statute was not intended to limit the Federal courts from giving relief, to persons in the District of Columbia deprived of constitutional rights, that would be available to persons in the various States from the appropriate Federal courts of those districts.

It may be, however, that measures short of physically destroying the records in question will prove adequate to assure complete and effective relief. For example, an order placing the original documents under seal and prohibiting disclosure of their contents, except upon further order of the District Court predicated on a showing of good cause, may provide a remedy reasonably equivalent to expungement in terms of protection of plaintiffs' rights. The balance of government interests may warrant different treatment for different police records. As we pointed out in Morrow v. District of Columbia, the chief threat to the individual who has been unlawfully arrested arises from the inclusion of his records in the police department's central criminal files. The precinct arrest books, on the other hand, which may have considerable value in preventing secret arrests, appear to be a less serious problem.[83] At its present stage of development, the record in the case at bar is insufficiently developed to permit an informed choice among these alternatives. Consequently, details of fashioning a suitable remedy are remitted to the District Court's further consideration on remand.

### 3. *Forfeitures of collateral bond.*

As a second direct consequence of the May Day arrests, those who had been taken into police custody were required to post collateral bond in order to secure their release from detention. In some instances, bail was set during the course of arraignments in the Superior Court. But a large number of the prisoners were not arraigned. Instead, the authorities followed a procedure whereby bond was accepted by police at the place of detention.

In the normal situation—with procedures for establishing the arresting officer's probable cause for arrests of particular individuals on specified charges—the practice of requiring the arrestee to post bail presents no serious difficulties; such measures are, indeed, often appropriate to insure that the accused is present for trial, and helpful to the accused, who may obtain release promptly in the locality of arrest without delay for arraignment. Nor are we concerned with the case where—regardless of the objective validity of the arrest—bail is set only after a judicial inquiry into the grounds of custody or legal restraint, like the conventional preliminary hearing before the Superior Court to determine whether there is probable cause to detain the accused.[84]

But a case in which the arrest itself is shown to be without foundation, where there has been no intervening inquiry—judicial or otherwise—as to probable cause, and where a bail requirement is automatically imposed, presents entirely different considerations.

In the present action, the Plaintiffs assert their readiness to demonstrate that precisely these circumstances were operative in the City of Washington during May, 1971. Specifically, they offer to prove that: Arrests were made on an arbitrary and indiscriminate basis, without limitation to observed unlawful conduct of the arrestee, and a significant proportion of the persons who were taken into police custody were, in fact, objectively innocent of any and all wrongdoing. With respect to many of these persons there was, at the time of their arrest, no evidence of criminal behavior sufficient to warrant a reasonable inference of probable cause; nor

83. 135 U.S.App.D.C. at 173–174, 417 F.2d at 741–742.

84. *See* Rule 5, D.C.Superior Court Rules (1971); Georgetown Univ.Law Center, The Preliminary Hearing 1–8, 12–23 (1967). *Cf.* Rule 5, Fed.R.Crim.P.

did such evidence become available at any time thereafter. Had any inquiry as to probable cause been made, these persons would have been entitled to immediate discharge from police custody, without the need to post collateral bond. But such inquiries were, in fact not made; and the prisoners were wholly deprived of any effective means to test the lawfulness of their detention. Rather, they were held pursuant to blanket informations filed by the Corporation Counsel. The informations were prepared on the basis of arrest data that was in fact faulty and should reasonably have been known to be inaccurate and erroneous; and at no time was there any inquiry by the public prosecutor into the circumstances of the arrest or the evidence available upon which a criminal prosecution could properly be instituted. These informations having been filed, the Corporation Counsel halted the process of arraigning prisoners in the Superior Court, thereby depriving them of the opportunity to obtain a prompt judicial inquiry into the basis for their being held in detention. Those who had been arrested were given the alternative of either posting a predetermined sum as collateral bond without any chance to litigate the lawfulness of their restraint or prolonging an illegal confinement until such time as the District authorities decided to resume arraignments.

Our decisions in Cooley v. Stone,[85] Brown v. Fauntleroy,[86] have highlighted the importance of the preliminary hearing as a procedure essential to the protection of Fourth and Fifth Amendment rights, a prerequisite to valid penal custody. There is considerable doubt whether the mere filing of a criminal information by the public prosecutor can serve as a constitutionally adequate substitute for a judicial determination of probable cause for detention. In circumstances of a continuing detention—without provision for such judicial determination—at least one court has held an essentially similar practice to be violative of due process.[87] We need not now consider this question as a general matter. It is sufficient for present purposes to conclude that gravest constitutional problems are presented by this withdrawal of a probable cause judicial hearing procedure if the proof does establish, as indicated, that the public prosecutor has not made a reasonable effort to determine the existence of probable cause, in the face of danger signals of insufficiency, and has sought to abort an inquiry by filing an information charging an offense.

■ We are not now discussing a case in which a prosecutor files a criminal information on the basis of arrest information, regular on its face and free from suspicion. Here, the Corporation Counsel had been brought into the Superior Court as early as May 3, on a writ to show cause and had been amply alerted of the serious challenges to the May 3 arrests. When, in addition, there is a proffer that many of the persons who obtained their release were misled by erroneous information as to the nature and consequences of posting bail and the circumstances under which the bond could be recovered, and when there was no substantial prospect of obtaining either a pretrial hearing to determine probable cause or an immediate trial on the merits, a Federal court plainly has jurisdiction of an action to invalidate the forfeiture of the bond, subject to a defense establishing an informed waiver of trial.

■ Under these circumstances, and depending on proof, we are of the view that the scope of remedial measures available to redress violations of Fourth and Fifth Amendment rights, *see* Bivens v. Six Unknown Named Agents, *supra,*

85. 134 U.S.App.D.C. 317, 414 F.2d 1213 (1969).

86. 143 U.S.App.D.C. 116, 442 F.2d 838 (1971).

87. Pugh v. Rainwater, 332 F.Supp. 1107 (S.D.Fla.1971). *See* Note, 25 Vand.L. Rev. 434 (1972).

may comprehend an order vacating the forfeiture of collateral and directing its return to the arrestee. On further reflection, however, we conclude that the paragraph of our order of October 1, 1971, on forfeiture of collateral (fn. 6, *supra*), is inappropriate at this stage, that temporary relief is not required, and the delineation of relief and of the class entitled thereto should be deferred to final order.[88] However, we do conclude that there may be jurisdiction to enter a final order in a class action seeking relief from forfeiture of collateral as necessary to vindicate Federal constitutional rights.

We emphasize that the Plaintiffs' quarrel is not with the judicial authorities of the District of Columbia. It is only nominally that the action, which seeks the return of monies that were transferred to the Superior Court, joins as a party defendant the Clerk of that Court. The essence of the complaint is that the sums acquired by forfeiture of collateral were a proximate result of an unfair, invalid and non-judicial process of obtaining the collateral. What is challenged is the action of the police— the combination of arrest, detention, requirement of bond as a condition of release.

Nor is Plaintiffs' case a disguised attack on the general procedure of having appropriate police officers designated as deputy clerks of Superior Court to accept stationhouse collateral—a salutary procedure that gives an option for earlier release than is provided by even reasonably prompt arraignment before a judicial officer. What is said to have happened in this case is a corruption of that procedure, climaxing and accentuating a widespread illegal-arrest condition with a procedure that provided not an even-earlier option to, but a circumvention of,

a reasonably prompt arraignment for testing unjustified detention. Under these conditions the judicial authority given to the police is claimed to have been put to the service of concealing, not ventilating, their executive transgressions. Under these circumstances, the Court that received the collateral essentially exercised a passive and custodial role, and its Clerk is a party defendant in only a nominal sense.

The nature and extent of relief on this phase of the case is a matter that has not been focused to this point, and we await development and refinement of the issues and problems before making any rulings. There are questions for future consideration not only as to definition of the eligible class, but of procedures for notification of individual members, and of possible alternatives in the event of impracticability of effective notification to individuals. Finally, the motivation for the prayer for recall of the forfeiture of the collateral may lie not so much in obtaining the modest sum of $10, as in assuring that the Superior Court record does not persevere as the record of an arrest for which there was no probable cause. If that be the case, it may be that appropriate relief may be provided by the Federal court without the need for pursuing funds. The matter requires exploration and ingenuity, and we accordingly remit the parties to the District Court for further consideration.

## IV. DISPOSITION

This court's order of October 1, 1971, is modified as hereinbefore set forth and, as so modified, is reaffirmed. The cause is remanded to the District Court for further proceedings not inconsistent with this opinion.

So ordered.

88. The District Court might well exclude from such relief all members of the plaintiff class (1) whose arrests were in fact supported by probable cause, that existed in substance as well as form; (2) who were arraigned in Superior Court and at that time given a full and fair opportunity to contest the lawfulness of their arrests; and (3) who, having been assigned specific dates to appear for trial in the Superior Court, knowingly and voluntarily elected to forfeit bond as an alternative to trial. But the comprehensive delineation of such subclasses is obviously a matter that must be determined by the District Court.